# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

### ORLANDO DIVISION
_____

| | | |
|---|---|---|
| JOSHUA D. POERTNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 6:12-cv-00803-GAP-DAB |
| | ) | |
| THE GILLETTE COMPANY and THE | ) | |
| PROCTER & GAMBLE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## DEFENDANTS' MOTION TO EXCLUDE

## THE TESTIMONY OF WALTER VAN SCHALKWIJK

## FOR ALL PURPOSES INCLUDING CLASS CERTIFICATION

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ..................................................................................................... 1

II.     STATEMENT OF FACTS ...................................................................................... 3

        A.      Background ................................................................................................... 3

        B.      Use of Testing Equipment and Methods that Fail to Meet Minimum
                Industry Specifications and Generally Accepted Standards ................................ 5

        C.      Use of Non-ANSI "Continuous Drain" Tests ........................................................ 7

        D.      Dr. van Schalkwijk is not an Expert in the Field of Statistics .............................. 9

III.    LEGAL STANDARDS .......................................................................................... 11

IV.     ARGUMENT ......................................................................................................... 13

        A.      Dr. van Schalkwijk's Testimony Should be Excluded because of his
                Use of Test Equipment and Methods that that Do not Meet Minimum
                Industry Requirements for Accuracy ................................................................. 13

        B.      Dr. van Schalkwijk Should not be Permitted to Testify about the
                Results of his Non-standard "Continuous Drain" Testing ................................... 15

        C.      Dr. van Schalkwijk Should not Be Permitted to Testify on Matters in
                the Field of Statistics, as He Admittedly is Unqualified to do so ....................... 16

V.      CONCLUSION ...................................................................................................... 17

## TABLE OF AUTHORITIES

**Page**

CASES

*City of Tuscaloosa v. Harcros Chems., Inc.*,
158 F.3d 548 (11th Cir. 1998) ..................................................................12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)..............................................................1, 11, 12, 13

*DePaepe v. General Motors Corp.*,
141 F.3d 715 (7th Cir. 1998) ....................................................................16

*Farmer v. DirectSat USA, LLC*,
2013 BL 76237 (N.D. Ill. 2013) ..........................................................16, 17

*Gayton v. McCoy*,
593 F. 3d 610 (7th Cir. 2010) ....................................................................16

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)............................................................................11, 13

Maiz v. Virani
253 F.3d 641 ...............................................................................................12

Mc*Corvey v. Baxter Healthcare Corp.*,
298 F.3d 1253 (11th Cir. 2002) ..........................................................12, 13

*Perry v. Schwarzenegger*,
2010 WL 3025614 (N.D. Cal.) ...................................................................13

*Sher v. Raytheon Co.*,
419 Fed. Appx. 887 (11th Cir. 2011)..........................................................12

*United States v. Frazier*,
387 F.3d 1244 (11th Cir. 2004) ..........................................................11, 12

*United States v. Hebah*
164 Fed. Appx. 678, 692 (10th Cir. 2006)..................................................14

*United States v. Reddy*,
2011 BL 166531 (N.D. Ga. 2011) ..............................................................17

*Williams v. Wells Fargo Bank*, N.A.
  280 F.R.D. 665, 670 (S.D. Fla. 2012) ....................................................................................12

*Wills v. Amerada Hess Corp.*,
  379 F.3d 32 (2d Cir. 2004) ....................................................................................................14

RULES

Fed. R. Evid. 402 .........................................................................................................................18

Fed. R. Evid. 403 .........................................................................................................................18

Fed. R. Evid. 702 ..........................................................................................................1, 2, 11, 18

Fed. R. Evid. 802 .........................................................................................................................18

OTHER AUTHORITIES

Part 1-2009, *American National Standard for Portable Primary Cells and Batteries
  with Aqueous Electrolyte—General and Specifications* (the "ANSI Standard")......................4

Defendants The Gillette Company ("Gillette") and The Procter & Gamble Company ("P&G") (collectively, "Defendants")[1] hereby move the Court, pursuant to Rule 702 of the Federal Rules of Evidence, for an order excluding the purported "expert" testimony of Dr. Walter van Schalkwijk for any purpose, including for purposes of the pending motion for class certification.   In support of this motion, Defendants state as follows:

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

Plaintiff has submitted the declaration (doubling as an expert report) of Dr. Walter van Schalkwijk in support of his motion for class certification.[2]  The Court should not consider that testimony in deciding the class certification motion.  Under Rule 702 and the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, Plaintiff has the threshold burden to establish the qualification and reliability of proffered expert testimony.  Plaintiff cannot meet that burden.

Plaintiff retained Dr. van Schalkwijk to test Duracell batteries, evidently in an attempt to show that the case has some merit.  In light of Dr. van Schalkwijk's deposition, it is no surprise that the discussion of his report has been relegated to a single passing footnote in the motion for class certification.  *See* Mot. p. 11, n.12.  During deposition, he admitted that his test results show that Ultra Power batteries *last longer* on average than CopperTop batteries, thereby corroborating Duracell's advertising claims.  Dr. van Schalkwijk conceded that he used test equipment and procedures that do not meet industry standards, and other expert

---

[1] For ease of reference, the business of Gillette of manufacturing and marketing Duracell brand batteries is sometimes referred to herein as "Duracell."

[2] *See* Declaration of Walter A. van Schalkwijk, Ph.D., attached as Ex. 20 to Plaintiff's Mot. for Class Certification and Incorporated Memorandum of Law (ECF 66) (hereafter "van Schalkwijk Report").

testimony establishes they are therefore unreliable and produce inaccurate and misleading results.  Compounding these errors, Dr. van Schalkwijk opines based on those results that Ultra Power, Ultra Advanced and CopperTop batteries are "statistically equivalent in their performance."  van Schalkwijk Report p. 3.  However, Dr. van Schalkwijk repeatedly admitted under oath that he is "not an expert in statistics," and thus he is utterly unqualified to render that opinion.[3]

Dr. van Schalkwijk's opinions and testimony should be excluded under Rule 702 because he relied on sub-standard testing equipment and methods, he performed inapposite tests, and he is not qualified to render opinions on statistics.  Specifically, Defendants ask the Court to exclude Dr. Schalkwijk's testimony regarding:

(1) The results of testing performed with equipment and methods that did not meet the minimum specifications and generally accepted standards for battery testing;

(2) If *all* of his test results are not excluded on the ground of his use of sub-standard equipment and methods, then at a minimum all results of the non-standard and inapposite "continuous drain" tests that he performed; and

(3) Opinions and analysis concerning the field of statistics, including without limitation, the statistical significance (or alleged lack thereof) of his test results.

## II.     STATEMENT OF FACTS

### A.     Background

In this putative class action, Plaintiff challenges advertising claims concerning Duracell's Ultra Advanced, Ultra Digital, Ultra Power and CopperTop batteries.  The

---

[3] *See* excerpts from Deposition of Walter A. van Schalkwijk, Ph.D., March 6, 2013 at 81:11-12, attached as Exhibit C to the Declaration of Darren Cottriel in Support of Defendants' Opposition to Plaintiff's Motion for Class Certification (hereafter "Cottriel Decl.").

advertising at issue includes the claims that Ultra Advanced AA size batteries last "Up To

30%  Longer In Toys* *vs. Ultra Digital" and that Ultra Power AA and AAA size batteries

are Duracell's "Longest Lasting," as compared to CopperTop.  *See, e.g.*, Second Amended

Complaint (ECF 54) ¶¶ 14, 19, 21.

Duracell, using state-of-the-art equipment and methods that meet or significantly

exceed minimum industry standards, has conducted extensive testing establishing that its

advertising claims regarding the Ultra batteries have at all times been true.[4]  There is no

competent evidence in the record of Plaintiff's motion that Duracell's test equipment or

methods fail to meet or exceed generally accepted industry standards.  In stark contrast, Dr.

van Schalkwijk performed his testing with equipment and tests that fail to meet industry

standards.

Plaintiff hired Dr. van Schalkwijk to test Duracell batteries, compare the performance

of these batteries relative to each other, and to opine on the results relative to Duracell's

performance claims.  *See* van Schalkwijk Report p. 1.  In the motion for class certification,

Plaintiff has downplayed the significance of the van Schalkwijk Report, but nevertheless

filed the entire report in a professed "abundance of caution" and referred to his purported

statistical findings in a single footnote.  *See* Mot. p. 11, fn. 12.  Dr. van Schalkwijk's results

when he used industry standard tests confirm that, on average, the Ultra Power batteries

outperformed the CopperTop batteries.[5]  It is only through use of other unreliable and

---

[4] *See generally* the Declaration of John Wells (hereafter "Wells Decl.") and the Declaration of Rosario Murguia ("Murguia Decl.") filed concurrently with Defs.' Opposition to Pl.'s Mot. for Class Cert.

[5] *See* Cottriel Decl. ¶ 4, Ex. C, 146:16-22 ("Q. -- is it correct that the Ultra Powers performed better than CopperTops on average in each of those tests?  A. Strictly using the mean, yes.  Q. And mean, not everybody uses that term, 'mean' means average?  A. Yes.").  *See also* Cottriel Decl. ¶ 5, Ex. D, 35:8-18 ("Q. Yesterday you testified under oath that your test results showed that the mean run times for the Ultra Powers were superior to the mean run times for the CopperTops in all the ANSI-approved tests, right?  A.  That is

inapposite tests and methods and the misapplication of statistics that he reaches the contrary conclusion that there is no statistical difference in their performance.

For alkaline batteries, the industry relies upon testing procedures and methods set by the American National Standards Institute ("ANSI").  *See* Murguia Decl. ¶ 6.  ANSI is a private, non-profit organization that oversees the development of standards for products and processes in the United States.  Wells Decl. ¶ 7.  The purposes of ANSI standards are to define a standard of performance, to provide guidance for its assessment and to provide guidance to consumers, manufacturers and designers.  *See id.* Ex. B, § 1.1.2.  The applicable standard is the ANSI C18.1M, Part 1-2009, *American National Standard for Portable Primary Cells and Batteries with Aqueous Electrolyte—General and Specifications* (the "ANSI Standard").  *Id.*  The ANSI Standard specifies minimum accuracy requirements for battery testing equipment.  The standard also defines the tests that are designed to simulate consumer use of batteries in categories of electronic devices.[6]

Dr. van Schalkwijk admits that the ANSI Standard is the industry standard for testing the batteries at issue.  In his report he wrote:

> My primary guide to testing has been  ANSI C18.1M, Part 1-2009, American National Standard for Portable Primary Cells and Batteries with Aqueous Electrolyte—General and Specifications, published by the National Electrical Manufacturers Association.  The published standard is a consensus wherein "substantial agreement has been reached by directly and material affected interests." . . . One of the purposes of the standard is to "provide a standard of performance and provide guidance for its assessment."  This is achieved in part by specifying "test conditions and procedures."

---

(continued…)

correct.  Q.  And you are saying if you had more test data it would lock in those means with more certainty, that is what you just testified to, right?  A.  That would be correct.").

[6] The ANSI Standard also provides specifications for other popular battery sizes and types.

van Schalkwijk Report p. 2. It is thus undisputed that this is the industry standard for assessing Dr. van Schalkwijk's expert testimony.

**B.    Use of Testing Equipment and Methods that Fail to Meet Minimum Industry Specifications and Generally Accepted Standards**

Dr. van Schalkwijk performed his testing using equipment manufactured by a Canadian vendor called Vencon (the "Vencon testers"). *See* van Schalkwijk Report p. 10. Apparently unbeknownst to Dr. van Schalkwijk until his deposition, this equipment does not meet ANSI specifications for battery testing and therefore is unreliable and inappropriate for the purposes for which he used it.

Specifically, the Vencon testers do not meet ANSI specifications for accurately measuring a battery's voltage, the current applied across the battery when discharging the battery, or the amount of current actually being drawn from the battery.[7] In layman's terms, "voltage" is the potential energy of a battery (*i.e.*, how hard a battery can push current), and "current" is the flow of electrical charge from the battery. Horn Decl. ¶ 5.

Generally speaking, the prescribed ANSI tests for evaluating battery performance apply defined loads of current to batteries according to defined "duty cycles" (*i.e.*, defined periods of on and off) and repeat the duty cycle until the voltage of the battery drops to defined end points. Wells Decl. ¶ 15-16. To accurately conduct these tests, the test equipment must be capable of accurately measuring voltage at the outset and at the endpoint, and accurately measuring the amount of current delivered to the battery. Horn Decl. ¶ 5.

---

[7] See Declaration of Quinn Horn, Ph.D. (hereafter "Horn Decl.") ¶¶ 5-6 and Ex. A (hereafter "Horn Report) p. 9-11, filed concurrently with Defs.' Opposition to Pl.'s Mot. for Class Cert.

The Vencon equipment fails to meet these ANSI specifications and therefore is unreliable. *Id.* ¶ 6.

Dr. van Schalkwijk has admitted that the Vencon testers do not meet the minimum ANSI specifications for accuracy.  Cottriel Decl. Ex. C, 121:12-14 (*e.g.*, "Q. So is the Vencon equipment spec within the limits of ANSI for current?  A.  No.").  Significantly, Dr. van Schalkwijk was not aware of this problem until it was raised during deposition.  He initially testified that he purchased the Vencon testers because "[t]he specifications were okay with regard to the voltage and current that I needed."  Cottriel Decl. Ex. C, 42:2-6. Later in the deposition, he testified that he was unsure what the Vencon specification is for testing voltage.  *Id.* at 117:1-118:22.  Eventually he admitted that the equipment did not meet specifications.  *Id.* at 121:12-14.  Moreover, he admitted that he has conducted no testing to quantify the effect on his test results of the fact that the Vencon equipment does not meet ANSI specifications.  *Id.* at 125:5-9.  In short, the equipment is unreliable and Dr. van Schalkwijk has not established otherwise.

In addition, Dr. van Schalkwijk's testing procedures were rife with other problems that render his results unreliable.  These include: (1) selection of and comparison of batteries of varying ages and storage histories, thereby failing to compare "apples to apples"; (2) use of incorrectly implemented ANSI test procedures; (3) failure to perform several of the ANSI specified tests; (4) use of different test procedures within the same testing group; (5) use of invalid methods for post-processing the test results; (6) lack of appropriate temperature and humidity control and recording in the testing area; and (7) use of non-calibrated testing equipment.  Horn Decl. ¶ 7.  Any one of these mistakes would warrant excluding his

testimony for failure to employ reliable principles and methods and to apply the principles and methods reliably to the facts of the case.  Taken together, these mistakes overwhelmingly demonstrate the lack of reliability of Dr. van Schalkwijk's test results and related opinions.

  **C.**  **Use of Non-ANSI "Continuous Drain" Tests**

  In addition to using equipment that was not capable of producing accurate results, Dr. van Schalkwijk performed non-standard tests that – even if performed with reliable precision – can only produce misleading and irrelevant results.  Horn Decl. ¶ 8.  Specifically, he performed two sets of "continuous drain" tests for all batteries he tested.  *See* van Schalkijk Report, pp. 8-9.  Continuous drain tests apply current to a battery continuously until the voltage is drained to the defined end point.  Horn Decl. ¶ 8.  This is in contrast to "intermittent" testing in which current is applied for a defined period of time and then the battery rests for a defined period of time before another load of current is applied, and so on until the voltage endpoint is reached.  *Id*.

  A problem with using continuous drain testing to simulate consumer use is that batteries are not designed to perform optimally under those conditions.  *Id.* ¶ 9.  Indeed, Dr. van Schalkwijk admits that an alkaline battery that is designed to perform best under intermittent conditions may actually not perform as well under continuous drain conditions due to inherent trade-offs in the design and materials used in the construction of the battery.  Cottriel Decl. Ex. C, 68:12-69:6.  When a battery is given a rest period between periods of usage, they can regain some of their capacity.  Horn Decl., ¶ 9.  Battery designers are aware of this and design batteries to perform optimally assuming there will be intermittent use.  *Id.*  A battery so designed, is thus not necessarily suited to perform optimally under a continuous

drain. *Id.* As a result, comparison of battery performance using continuous drain testing can produce results that are not representative of what a consumer will experience in normal usage (*id.*) and therefore these tests will result in misleading conclusions.

All of the ANSI Standard specified tests are intermittent in nature. *Id.* ¶ 8. This reflects ANSI's conclusion that intermittent testing best reflects expected consumer usage (*e.g.*, a television remote control or a child's toy) and that consumers rarely install a new battery in a device and leave it on until the battery is drained. *Id.* ANSI specifies nine performance tests for alkaline AA batteries: Digital Camera; Photo Flash; Toothbrush; CD/Electronic Games, Digital Audio; Portable Lighting; Toy; Remote Control; and Radio/Clock. Wells Decl. ¶ 15, Ex. B, p. 19. Five performance tests are specified for alkaline AAA batteries: Photo Flash; Portable Lighting; Toy' Digital Audio; and Remote. *Id.* at p. 21. These tests simulate the use of batteries in the specified device classes as they would be used by most consumers and, as a result, these tests have changed over time and will continue to do so in the future. Because none of these standard tests are continuous drain, it is immaterial that Dr. van Schalkwijk purports to have found that Duracell's Ultra batteries did not outperform the CopperTop batteries in continuous drain testing. Indeed, this simply underscores the critical importance of selecting the correct tests to perform.[8]

While Dr. van Schalkwijk did not contend in his report that continuous drain testing simulates consumer use of batteries, at deposition he argued that a consumer might put a battery in an electric lamp or a flashlight and let it run until it runs down completely. Cottriel Decl., Ex. C, 63:12-21. When pressed, he conceded that he had "no idea" what percentage of

---

[8] While continuous drain testing is common for some rechargeable batteries (*e.g.,* lithium-ion), it is rarely, if ever, used by battery professionals in the alkaline battery industry to mimic consumer usage because it is generally accepted that it does not reflect how consumers actually use batteries. Horn Decl., ¶ 8.

consumers use batteries in such a fashion, that he did not know whether it was more than one percent, and that he had "no opinion on that whatsoever" on the subject. *Id.* at 63:22-64:13.

Dr. van Schalkwijk also attempts to justify his use of continuous drain testing by pointing to Duracell "datasheets." van Schalkwijk Report p. 7-8. But this is an inappropriate use of these datasheets. Horn Decl. ¶ 10. Battery manufacturer datasheets are a resource for device designers and are frequently used to determine which battery size and chemistry is most appropriate for a specific device (*e.g.*, AA versus AAA alkaline, or AA lithium versus AA alkaline). *Id.* The datasheets provide a wealth of technical information that can be used by device designers to make reasonable estimations for how the battery will operate in a variety of conditions. They are not, however, intended to be used for assessing expected battery life in common consumer devices. *Id.*

### D.    Dr. van Schalkwijk is not an Expert in the Field of Statistics.

It is crystal clear – in fact expressly admitted – that Dr. van Schalkwijk lacks expertise in the field of statistics. His resume is devoid of any experience qualifying him as an expert in statistics; indeed the word "statistics" never appears in the statement of "Qualifications" in his report or in his Curriculum Vitae. *See* van Schalkwijk Report pp. 1, Ex. 1. He removed all doubt on this issue during his deposition:

> Q. . . . In your qualifications section, I didn't see anything – maybe I missed it – on your qualifications as a statistician. Do you hold yourself out as an expert in the field of statistics?
>
> A. I do not.
>
> Q. Are you an expert in statistics?
>
> A. I would not qualify myself – characterize myself as such.

Q. Do you have an advanced degree in statistics?

A. I do not.

Q. Was it a major field of study in your education undergrad?

A. It was not.

Cottriel Decl. Ex. C, 49:5-19.  Later, when asked about one of the principles of statistics relevant to his analysis, Dr. van Schalkwijk repeated the concession:  "Q.  Are you an expert in applying Anderson-Darling?  A.  No.  I have told you I'm not an expert in statistics."  *Id.* at 81:9-12.

Notwithstanding this admitted lack of expertise, his report is fundamentally premised on statistical analysis.  Throughout his report, he relies repeatedly on statistics to draw conclusions about the significance of his test results.  Examples (with emphases added) include:

- "Based on my testing of AA and AAA batteries for this case, I found that the Coppertop [sic], Ultra Advanced, and Ultra Power batteries are *statistically equivalent* in their performance."  van Schalkwijk Report p. 3.

- "Regardless [of design differences between them] there is *no statistical difference* in the performance of Ultra Advanced, Ultra Power, Ultra Digital or CopperTop.  *Id.* at fn. 7.

- "'*Statistically equivalent*' means that over the aggregate of the tests performed, the CopperTop, Ultra Advanced, and Ultra Power batteries have 'run times' or other performance metrics that do not clearly favor one battery over another."  *Id.* at p. 3.
  .
- "In fact, the tests I performed on AA and AAA CopperTop, Ultra Advanced, Ultra Power, and Ultra Digital batteries using standard tests for battery evaluation to simulate use in a toy revealed that the Ultra Power, Ultra Advanced and CopperTop batteries were *statistically identical* in performance as measured by run time."  *Id.* at p. 4.

- "Other than the change in branding and marketing, there is *no statistically discernable difference* between the lifespan and power of the Ultra Advanced and Ultra Power batteries." *Id.*

Demonstrating his admitted lack of expertise, Dr. van Schalkwijk committed multiple, fundamental errors in performing his purported statistical analysis.  Because his lack of expertise requires exclusion of his testimony, there should be no need to  assess these profound mistakes.  It is  nonetheless worth noting that his methods and assumptions are demonstrably wrong and invalidate his conclusions.  Among these mistakes, he incorrectly assumed that the samples of test results he was comparing were "normally distributed."  *See* Declaration of Duane Steffey, Ph.D., Ex. A, pp. 6-12, filed concurrently with Defs.' Opposition to Pl.'s Mot. for Class Cert. (hereafter "Steffey Decl."). While this is a highly technical matter of statistics, there is no question that this assumption is critical and that Dr. van Schalkijk erred in making it.  This invalidates virtually all of his statistical opinions and conclusions.  Moreover, even a cursory review of Dr. Steffey's Report illustrates the complexity of the statistical analysis at issue, thereby showing that it is an area in which only true experts are qualified to testify.  *See generally*  Steffey Decl. Ex. A.

## III.    LEGAL STANDARDS

Federal Rule of Evidence 702 requires exclusion of expert testimony unless (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.  In admitting expert testimony under Rule 702, courts serve as a gatekeeper "to ensure the reliability and relevancy of expert testimony."

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Daubert*, 509 U.S. at 589 n. 7.

The burden of establishing the foundational requirements of "qualification, reliability, and helpfulness" rests on the party proffering the expert opinion and must be demonstrated by a "preponderance of proof."  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004); *see also Daubert*, 509 U.S. at 592 n.10.  The Eleventh Circuit has developed a "rigorous three-part inquiry" to ensure that each of these foundational elements are satisfied. *United States v. Frazier*, 387 F.3d at 1260.  Thus, district courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id*. (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).  In short, the Court is to "ensure that speculative, unreliable expert testimony does not reach the jury."  Mc*Corvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

"[R]ulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology."  *McCorvey*, 298 F.3d at 1257.  Thus, it is inappropriate to reserve critiques of an expert's methodology for cross-examination, because doing so "implicitly reject[s] the gatekeeper function of the trial courts specifically prescribed by the Supreme Court."  *Id*.  Plaintiff must establish the reliability of Dr. van Schalkwijk's testimony as a prerequisite to admission.  *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001) (plaintiff has burden to show "the methodology by which the expert reach[ed] his conclusions is sufficiently reliable.").

A district court must conduct a *Daubert* analysis in evaluating and weighing expert evidence presented at the class certification stage.  *See Sher v. Raytheon Co.*, 419 Fed. Appx. 887, 888 (11th Cir. 2011) ("We hold that that district court erred as matter of law by not sufficiently evaluating and weighing conflicting expert testimony presented by the parties at the class certification stage."); *see also Williams v. Wells Fargo Bank*, N.A., 280 F.R.D. 665, 670 (S.D. Fla. 2012) ("Before certifying a class action, a district court must sufficiently weigh expert testimony on the issue of class certification.").

To the extent Plaintiff argues that the shortcomings of Dr. van Schalkwijk's testimony go its weight, rather than its admissibility, Plaintiff is mistaken.  While cross-examination, presentation of contrary evidence and instruction on the burden of proof are appropriate means of attacking shaky but admissible evidence (*Daubert*, 509 U.S. at 596), where – as here – the testimony is neither reliable nor relevant, it must be excluded.  *See Kumho*, 526 U.S. 152; *see also McCorvey*, 298 F.3d at 1257.

## IV.   ARGUMENT

### A.   Dr. van Schalkwijk's Testimony Should be Excluded because of his Use of Test Equipment and Methods that Do not Meet Minimum Industry Requirements for Accuracy.

Plaintiff cannot carry his burden of demonstrating the admissibility of Dr. van Schalkwijk's testimony.  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.* (*Daubert II*), 43 F.3d 1311, 1319 n.11 (9th Cir. 1995) ("[T]he party proffering expert evidence "must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has both chosen a reliable [] method and followed it faithfully.").  Dr. van Schalkwijk admitted that the ANSI Standard represents "a consensus wherein 'substantial agreement has

been reached by directly and material affected interests'" and that it was his "primary guide

to testing."  *See* van Schalkwijk Report p. 2.  It is undisputed that the ANSI Standard sets

minimum requirements for the ability of *test equipment* to measure accurately voltage and

current.  It is undisputed that the ANSI battery tests require accurate measurement of voltage

and current.  It is undisputed that the Vencon testers used by Dr. van Schalkwijk fail to meet

those specifications.  And it is undisputed that Dr. van Schalkwijk has failed to quantify the

effect on his test results of the fact that the Vencon equipment does not meet ANSI

specifications.  Cottriel Decl. Ex. C, 125:5-9.  In short, the equipment is unreliable and Dr.

van Schalkwijk has not established otherwise.

Adding to the lack of reliability are the multiple additional flaws in Dr. van

Schalkwijk's procedures and methods.  These are discussed at length in the expert report of

Dr. Quinn Horn (who, incidentally, Dr. van Schalkwijk "respects as an expert in batteries").

*Id.* at 215:24-216:1.  Considered in isolation, each of these methodological flaws discredits

the reliability of Dr. van Schalkwijk's test methods and results.  Taken together, especially in

addition to the use of unreliable testers, and there is ample basis to exclude the testimony.

Failure of an expert to adhere to generally accepted industry standards is grounds for

excluding expert testimony.  In *United States v. Hebah*, the court affirmed the district court's

exclusion of expert testimony, which rested in part on the expert's improper use of "a

'shortcut' process rather than [using] standard psychological tests such as the MMPI," and

his failure "to use real or standard IQ tests, performed under strict testing conditions."  164

Fed. Appx. 678, 692 (10th Cir. 2006).  Similarly, in *Wills v. Amerada Hess Corp.*, the court

held that the district court did not abuse its discretion in excluding expert testimony in part

because the expert's theory was not generally accepted in the scientific community.   379

F.3d 32, 49 (2d Cir. 2004) ("the district court determined that the 'dose-response

relationship' was the more generally accepted theory of causation in the scientific

community, and that the [expert's theory, as the expert] conceded in his deposition

testimony, was controversial.  The district court's assessment was entirely appropriate . . .").

      Similar to the experts in *Hebah* and *Wills*, here Dr. van Schalkwijk failed to adhere to

generally accepted industry standards – the ANSI Standard.  On this basis alone, the Court

should exclude his testimony.

> **B.**    **Dr. van Schalkwijk Should not be Permitted to Testify about the Results of his Non-standard "Continuous Drain" Testing.**

      Applying the same legal analysis, the Court should exclude all testimony from Dr.

van Schalkwijk concerning his testing and results using the non-standard continuous drain

tests.  While, as Dr. Horn notes, there is a purpose for continuous drain testing, there is no

industry standard that specifies its use when attempting to mimic consumer usage of

electronic devices for purposes of predicting battery life.  Horn Decl. ¶ 8.  The ANSI

Standard includes lists of tests for testing batteries for consumer use.  Each of these is an

intermittent use test, with duty cycles that include loads and rest periods.  Duracell performs

each of these tests.  *See* Wells Decl. ¶¶ 14-16.

      Dr. van Schalkwijk's use of continuous drain tests fails to meet any generally

accepted industry standard for simulating consumer usage of the most popular electronic

devices.  Horn Decl. ¶ 8.  It is insufficient that continuous drain testing is used for some

purposes in the battery industry.  The burden rests with Plaintiff to prove by a preponderance

of the evidence that continuous drain testing is a generally accepted and reliable means of

testing longevity in alkaline batteries intended for the consumer market.  Dr. van Schalkwijk admitted that he has "no idea" what percentage of consumers use batteries in a continuous drain fashion and ad "no opinion on that whatsoever" on the subject.  *Id.* at 63:22-64:13. Without that foundation, his continuous drain testing is meaningless.

Moreover, because, as Dr. van Schalkwijk admitted and Dr. Horn has confirmed, batteries are designed to perform optimally in intermittent use and as a result may perform more poorly in a continuous drain test, it would be a perversion to apply a continuous drain standard to batteries in today' marketplace.  Permitting Dr. van Schalkwijk to present such testimony would surely result in confusion and misleading of the fact finder.

### C.   Dr. van Schalkwijk Should not Be Permitted to Testify on Matters in the Field of Statistics, as He Admittedly is Unqualified to do so.

In spite of the pervasive flaws in his test equipment and methods, Dr. van Schalkwijk determined that on average Duracell's Ultra Power batteries lasted longer than CopperTop batteries.  *See* Discussion at footnote 5, *supra*.  Dr. van Schalkwijk thus resorted to the science of statistics to opine that there is "no statistical difference" in the batteries' performance.  *See, e.g.*, van Schalkwijk Report p. 3.  Without that giant leap of faith, he has no grounds for opining that the Ultra batteries generally do not last longer than CopperTop batteries.

Such statistical analyses are inherently complex and, because no jury can be expected to fully understand them, courts must be particularly vigilant before allowing an expert to put his imprimatur of knowledge on them.  *See DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) ("District courts must be careful to keep experts within their proper scope, lest  apparently scientific testimony carry more weight with the jury than it

deserves.").  Whether a witness is qualified as an expert is determined by comparing the area

in which the witness has superior knowledge, skill, experience, or education with the subject

matter of the witnesses' testimony.  *Gayton v. McCoy*, 593 F. 3d 610, 616 (7th Cir. 2010);

*Farmer v. DirectSat USA, LLC*, 2013 BL 76237 (N.D. Ill. 2013).

In *Farmer*, the court excluded the testimony of an expert because his testimony

essentially concerned statistics and the purported expert did not consider himself an expert in

statistics:

> At its core, Becker's opinions are based upon a statistical sampling analysis
> whereby he employs a purportedly representative sample . . . for the purpose
> of extrapolating to the entire population.  This type of analysis, however, is
> not the area in which Becker has superior knowledge, skill, experience or
> education. . . . *He does not consider himself an expert* in designing
> scientifically valid samples . . . .  Thus, he is not qualified to provide expert
> testimony based on the statistical sampling analysis and subsequent
> mathematical calculations he provides in this case.

*Id.* at *4 (emphasis added).  Similarly, in *United States v. Reddy*, 2011 BL 166531 (N.D. Ga.

2011), the court excluded expert testimony regarding statistics because of the experts' lack of

qualifications in the field of statistics.  *Id.* at *7 (finding that the person who developed the

statistical strategy to collect the data sample, as well as the person who concluded that the

sample he reviewed was statistically accurate as a random selection, must be experts in

statistics).

As in *Farmer*, Dr. van Schalkwijk's candid admission that he is not an expert in

statistics requires the exclusion of any testimony or opinions from him in that field.

Permitting him to state broad conclusions about the "statistically significance" of his test

results would present a massive risk of misleading any finder of fact.  All such testimony

should be excluded.

## V.      CONCLUSION

For the foregoing reason, Defendants respectfully request that the Court enter and order excluding from evidence for all purposes, including for the class certification motion, the testimony and/or opinions of Dr. van Schalkwijk regarding: (1) The results of testing performed with equipment that did not meet the minimum specifications for battery testing equipment established by applicable industry standards; (2) If *all* of his test results are not excluded on the ground of his use of sub-standard equipment, then at a minimum all results of the non-standard "continuous drain" tests that he performed; and (3) Opinions and/or conclusions concerning the field of statistics, including without limitation, the statistical significance (or alleged lack thereof) of his test results.[9]

Dated: May 13, 2013                         Respectfully submitted,


                                            /s/ Darren K. Cottriel
                                            Darren K. Cottriel (*Pro Hac Vice Admission*)
                                            JONES DAY
                                            3161 Michelson Drive, Suite 800
                                            Irvine, CA 92612
                                            Telephone:     949.553.7548
                                            Facsimile:     949.553.7539
                                            E-mail:        dcottriel@JonesDay.com

                                            Jason McDonell (*Pro Hac Vice Admission*)
                                            Craig E. Stewart (*Pro Hac Vice Admission*)
                                            JONES DAY
                                            555 California Street, 26th Floor
                                            San Francisco, CA  94104
                                            Telephone:     415.626.3939
                                            Facsimile:     415.875.5700
                                            E-mail:        jmcdonell@JonesDay.com

---

[9] In addition to the specific objections briefed herein, Defendants object to the van Schalkwijk Declaration as hearsay (FRE 802), lack of personal knowledge (602), improper opinion testimony (FRE 602, 702), speculation (FRE 403), prejudicial (FRE 403) and relevance/materiality grounds (FRE 402).

E-mail:         cestewart@JonesDay.com

Jason A. Perkins, Esq. (State Bar No. 610852)
CARLTON FIELDS, P.A.
450 S. Orange Avenue, Suite 500
Orlando, FL 32801
Telephone: 407.849.0300
Facsimile:  407.648.9099
E-mail:       jperkins@carltonfields.com

*Attorneys for Defendants*
*THE GILLETTE COMPANY and THE*
*PROCTER & GAMBLE COMPANY*

SFI-824951v3