# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION
Judge Gregory A. Presnell

Civil Action No. 6:12-cv-00803-GAP-DAB

**JOSHUA D. POERTNER,** individually and on behalf of all others similarly situated,

    Plaintiff,

v.

**THE GILLETTE COMPANY and PROCTER & GAMBLE COMPANY**

    Defendants.

---

## Objection to Class Settlement in *Poertner v. The Gillette Company, et al*

---

Paul Dorsey
*Pro Se*
110 Westminster Drive
West Hartford, CT  06107
(860) 521-0081
p.dorsey@comcast.net

# TABLE OF CONTENTS

TABLE OF CONTENTS

I.     The Objector is a Member of the Class.

II.    The Court has a Fiduciary Duty to the Unrepresented Members of This Class.

III.   The Class Should Not be Certified.

       A. The Unbounded Class Definition Violates Fed. R. Civ. P. 23(e)(1) + 23(e)(5).

       B. Class Counsel Failed to Adequately Represent Class – Promised Spanish
          Website Never Created.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

       C. Class Counsel Failed to Adequately Represent the Class – Promised Website
          www.UltraBatterySettlement.com Is Not Used and Class Members Are
          Instead Redirected to a Different Website Without Warning.

IV.    Notice Is Insufficient Under Rule 23 Because It Fails To Set Forth The Basis For
       Requested Attorneys' Fees.

V.     The Notice Plan's Reach Calculation on 70.4% IS NOT Credible and Should Not be
       Relied Upon.

VI.    Sunshine is the Best Disinfectant:  Results Should be Made Public.

VII.   This Court Should Not Infer Settlement Approval From a Low Number of Objectors

## I.     The Objector is a Member of the Class.

Paul Dorsey purchased at least one package of Duracell Ultra Advanced batteries (size AA) on Monday, September 6, 2010 (a/k/a Labor Day) at the Walgreens store located in the Elmwood section of West Hartford, CT.  Mr. Dorsey also purchased one package of Duracell Ultra Power (size AA) and one package of Duracell Ultra Power (size AAA) on Monday, February 17, 2014 from Amazon.com, the internet retailer.

As further documented in the accompanying Declaration of Paul Dorsey in Support of Objection ("Dorsey Decl."), Paul Dorsey is a Settlement Class Member, with standing to object to the settlement and fee request.  Dorsey Decl ¶¶ 1 – 14 & Exhibits A + B.

Mr. Dorsey is not an attorney, but he intends to appear *pro se* at the fairness hearing, scheduled for Friday, March 21, 2014 at 1:00 p.m.

## II.    The Court Has a Fiduciary Duty to the Unrepresented Members of This Class.

"Both the United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust Litigation*, 360 F. Supp. 2d 166, 192-94 (D. Mass. 2005), citing *inter alia Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 623 (1997) ("Rule 23(e) protects unnamed class members from 'unjust or unfair settlements' agreed to by 'fainthearted' or self-interested class 'representatives.'"); see also *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279-80 (7th Cir. 2002) ("district judges [are] to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" prior to settlement).

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members.... [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F. 3d 768, 785 (3d. Cir. 1995) (quoting *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir. 1975)). See also *Riker v. Gibbons,* 2010 WL 4366012, at *2 (D. Nev. Oct. 28, 2010). "A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class." Herbert Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 13:20 (4th ed. 2002). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon,* 957 F.2d 697, 701 (9th Cir. 1992). *Accord Diaz v. Trust Territory of Pacific Islands,* 876 F.2d 1401, 1408 (9th Cir. 1989).

There should be no presumption in favor of settlement approval: "[t]he proponents of a settlement bear the burden of proving its fairness" *True v. American Honda Co.,* 749 F. Supp.2d 1052, 1080 (C.D. Cal. 2010) (*citing* 4 NEWBERG ON CLASS ACTIONS § 11:42 (4th ed. 2009)). *Accord* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010) ("*ALI Principles*"). "In reviewing the settlement the judge is called upon to be impartial and neutral, favoring neither the proponents of the settlement nor those who are opposed or absent." *In re Smith,* 926 F.2d 1027, 1028 (11th Cir. 1991) (quoting *Moore's Federal Practice, Manual for Complex Lit. 2d* § 23.14 at 160 (1986)).

In short, "[c]areful scrutiny by the court is 'necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of the absent class members.'" *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1147 (11th Cir. 1983) (quoting *U.S. v. City of Miami*, 614 F.2d 1322, 1331 (5th Cir. 1980), *modified on other grounds*, 664 F.2d 435 (5th Cir. 1981) (en banc)). "Because of the potential for a collusive settlement, a sellout of a highly meritorious claim, or a settlement that ignores the interests of minority class members, the district judge has a heavy duty to ensure that any settlement is 'fair, reasonable, and adequate' and that the fee awarded plaintiffs' counsel is entirely appropriate." *Piambino v. Bailey,* 757 F.2d 1112, 1139 (11th Cir. 1985) (*Piambino II*). "Under Rule 23(e) the Court 'acts as a fiduciary who must serve as a guardian of the rights of absent class members.'" *In re Skinner Group, Inc.*, 206 B.R. 252, 259-60 (N. D. Ga. 1997) (citations omitted). For this reason, "the court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *Id.*

It is insufficient that the settlement happened to be at "arm's length" without express collusion between the settling parties; because of the danger of conflicts of interest, third parties must monitor the reasonableness of the settlement as well. "If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003). Courts must be "vigilant not only for explicit collusion," but also for "more subtle ... warning signs" that class counsel's self-interest has trumped its obligations to fairly and adequately protect the interests of the class. *In re*

*Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 2011 U.S. App. LEXIS 17224, *28-29

(9th Cir. Aug. 19, 2011).

## III.   The Class Should Not Be Certified.

### A. The Unbounded Class Definition Violates Fed. R. Civ. P. 23(e)(1) and 23(e)(5).

Fed. R. Civ. P. 23(e)(1) requires the court to direct reasonable notice of the settlement

to all members of the class who would be bound by the settlement. Notice allows class

members a sound platform for assessing the strengths and weaknesses of the case, the merits

and demerits of the settlement in deciding whether to object or opt-out—when that right is

available.[1] Unless each package of Duracell Ultra Power batteries (size AA and AAA)

contains a notice of impending class action settlement, and warns customers that by

purchasing the product they will become class members, those who purchase in the time

immediately before the final approval order will not receive adequate notice.

Even if somehow these late-purchasing class members learn of the settlement, the

objection and opt-out deadline will have passed by that time. See this Court's "Order

Granting Unopposed Motion For Preliminary Approval of Class Action Settlement, Directing

Dissemination of Notice and Other Relief" (Dkt. 118) ¶¶21 + 26 (setting the opt-out and

objection deadline as February 28, 2014). Individuals who enter the class after the objection

deadline will be deprived of their Fed. R. Civ. P. 23(e)(5) right of objection. Were this

proceeding merely a class certification and litigation to final judgment under 23(b)(2), there

---

[1] *See* 7B Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE, § 1787 at 220 (2d ed.1986); 2 NEWBERG ON CLASS ACTIONS, § 8.04 at 8-17 ("[T]he purpose [of notice is] allowing the parties to make conscious choices that affect their rights in a litigation context.").

would be no concomitant statutory right to notice or objection—but as a 23(e) settlement, the class does have those rights and the class definition effectively obliterates that right for a substantial subclass.

A threshold requirement in any potential Rule 23 certification is that the named plaintiffs propose an identifiable, unambiguous class.[2] This means that at the very least every class definition should include at least: (1) a specification of a particular group at a particular time frame and location who were harmed in a particular way; and (2) a method of definition that allows the court to ascertain its membership.[3] A well-defined class is necessary "to ensure that the class is neither amorphous, nor imprecise" *Johnson v. District of Columbia*, 248 F.R.D. 46, 52 (D.D.C. 2008) (quoting *Lewis v. Nat'l Football League*, 146 F.R.D. 5, 8 (D.D.C. 1992)). "Clearly delineating the contours of the class…serves several important purposes." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591-592 (3d Cir. 2012). These principles are violated by a class definition that has no definite class period and is only bounded by the issuance of a final approval order at an indeterminate future date.

Those courts that have analyzed the issue unanimously reached the same conclusion: proposed classes with no fixed end date must be denied certification.[4] Commentators agree.[5]

---

[2] *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 28 (D.D.C. 2012), *rev'd on other grounds* 2013 U.S. App. LEXIS 16500 (D.C. Cir. Aug. 9, 2013) ("The first implied requirement of Rule 23(a) is that the class must be sufficiently defined so as to be identifiable as a class.") (internal quotation omitted); Federal Judicial Center, MANUAL ON COMPLEX LITIGATION §21.222 (4th ed. 2004) ("The definition must be precise, objective, and presently ascertainable").

[3] *See e.g.*, *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 477 (S.D. Ohio 2004).

[4] *See Mueller v. CBS, Inc.*, 200 F.R.D. 227, 236 (W.D. Pa. 2001); *Saur v. Snappy Apple Farms, Inc.*, 203 F.R.D. 281, 285-86 (W.D. Mich. 2001); *In re Wal-Mart Stores, Inc.*, No. 06-02069, 2008 WL 1990806, 2008 U.S. Dist. LEXIS 109446, at *15-*16 (N.D. Cal. May 2, 2008); *Alaniz v. Saginaw County*, No. 05-10323, 2009 U.S. Dist. LEXIS 43340, at *5 (E.D.

The Supreme Court has itself even "recognize[d] the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous" *Amchem*, 521 U.S. at 628. But even if Rule 23(e)(1) and (5) could be read to allow this open-ended class definition, the constitutional questions that would arise under *Mullane*[6] counsel against such an interpretation under the well-established canon of construction to avoid constitutional doubt. See *e.g.*, *Wal-Mart*, 131 S. Ct. at 2559 (construing 23(b)(2) to avoid potential unconstitutionality); *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 103-04 (1981) (holding district court's order forbidding communication between counsel and absent class members violated Rule 23, and thus declining to decided whether such a ban violated the First Amendment).

Accepting that 23(e)(1) and (5) limit the availability of classes that veer unbridled into the future is neither unprecedented, nor need it be conceived of as a radical sea-change. Rather, class plaintiffs will be able to assert the same exact claims for the same exact relief; all that will be different is that absent class members will have the opportunity to receive the notice to which they are constitutionally entitled. As presently defined, the class may not be certified.

---

Mich. May 21, 2009); *Trollinger v. Tyson Foods, Inc.*, No. 4:02-CV-23, 2007 U.S. Dist. LEXIS 88866, at *8–*11 (E.D. Tenn. Dec. 3, 2007); *Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050, 2009 U.S. Dist. LEXIS 62817, at *3-*5 (N.D. Cal. Jul. 2, 2009); *Wike v. Vertrue, Inc.*, 2010 WL 3719524, 2010 U.S. Dist. LEXIS 96700 (M.D. Tenn. Sept. 15, 2010); *see also Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 85 n.2 (S.D.N.Y. 2001).
[5] *See* Elizabeth R. Kaczynski, Note, *The Inclusion of Future Members in Rule 23(b)(2) Class Actions*, 85 COLUM. L. REV. 397 (1985) (asserting that including future members in class actions "is inconsistent with both the explicit requirements and the theoretical underpinnings of Rule 23" and poses "a serious threat to the due process rights of future members"); Samuel Issacharoff, *Class Action Conflicts*, 30 U.C. DAVIS L. REV. 805, 833 (1997) (advocating for "presumption against...non-closed class actions in which the class cannot be presently defined.").

**B. Class Counsel Failed to Adequately Represent the Class – Promised Spanish Website Never Created.**

In this Court's "Order Granting Unopposed Motion For Preliminary Approval of Class Action Settlement, Directing Dissemination of Notice and Other Relief" (Dkt. 118), the Court found that:

> "... compliance with the Notice Plan is the best practicable notice under the circumstances and constitutes due and sufficient notice of this Order to all persons entitled thereto and is in full compliance with the requirements of Rule 23, applicable law, and due process." (Doc 118, ¶18 at 6)

On page 21 of the Notice Plan (Doc 114-4, Exhibit 1, page 35 of 64), under the "Case Website" section, the promise of a Spanish language Notice is very clear: "Allows Class Members access to a Spanish language Notice and Claim Form" (see 4th bullet point).

In addition, in the "Declaration of Gina M. Intrepido-Bowden on Adequacy of Proposed Settlement Notice Program," the following was stated:

> "An informational website will be established to allow Class Members the ability to submit a claim online and obtain additional information and documents about the settlement. The Notices and Claim Form will also be available in Spanish for Spanish-speaking Class Members. The website address will be prominently displayed in all printed notice materials and accessible through a hyperlink embedded in the internet banner notices." (Doc 114-4, ¶25 at 10-11)

also

> "[ ]. English language Notices will contain a Spanish tag directing Spanish-speaking Class Members to the case website for a Notice in Spanish. Likewise, the Spanish language Notice appearing in *People en Español* will contain an English tag directing English-speaking Class Members to the case website for a Notice in English. [ ]" (Doc 114-4, ¶28 at 11)

---

[6] Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950).

But as of February 27, 2014, the Spanish version of the website does not exist. See Dorsey Declaration ¶15. Class Counsel has a duty to continuously protect the due process rights of all Class Members, including its Spanish speaking members.

Given Class Counsel's failure to properly monitor the Settlement Administrator's work product, this Class can not be certified. The issue here is not that the Settlement Administrator was negligent and that as a result the Notice to the Class does not meet due process and/or Rule 23 standards. The issue is that Class Counsel's failure to discover and correct the Settlement Administrator's error is a strong indication that Class Counsel did not meet its professional responsibility to the class – in other words, Class Counsel did not adequately represent the Class.

Mr. Dorsey asks this Court to take note of the fact that: 1) the Settlement Administrator's Declaration (Doc 122) was filed by the Mr. Darren Cottriel, a Lead Attorney for the Defendant Proctor & Gamble Company. By information and belief, this task is usually performed by Class Counsel and 2) that the Settlement Agreement calls for the Settlement Administrator to be paid by the Defendants:

> "The cost, fees and expenses of administration and of disseminating Notice in accord with the Notice Plan, and administration of the claims process, shall be paid by P&G." (Doc 113-1, ¶35 at 17).

To a certain extent, these two facts lend further support to Mr. Dorsey's belief that Class Counsel did not adequately represent the class: the Claims Administrator's day-to-day working relationship is with the Defendant, not Class Counsel.

### C. Class Counsel Failed to Adequately Represent the Class – Promised Website www.UltraBatterySettlement.com Is Not Used and Class Members Are Instead Redirected to a Different Website Without Warning.

As previously quoted above, in the "Declaration of Gina M. Intrepido-Bowden on Adequacy of Proposed Settlement Notice Program," the following was stated:

> "An informational website will be established to allow Class Members the ability to submit a claim online and obtain additional information and documents about the settlement. The Notices and Claim Form will also be available in Spanish for Spanish-speaking Class Members. The <u>website address</u> will be prominently displayed in all printed notice materials and accessible through a hyperlink embedded in the internet banner notices." (Doc 114-4, ¶25 at 10-11). Underling added.

Yet, a user attempting to access [ www.UltimateBatterySettlement.com/ ] is instead redirected to a different website, [ https://eclaim.kccllc.net/caclaimforms/DUB/home.aspx ].

To a certain extent, this redirection in website addresses triggers a fear reflex in the internet user. The learned reaction is to suspect some sort of spaming or virus planting operation. Accordingly, the chance that the class member will read the site's material is greatly diminished.

Class Counsel should have been monitoring this web-site (which they weren't, as discussed immediately above) and should have objected to the Settlement Administrator's tactics. At a minimum, the redirection scheme should have been directly disclosed to this Court, preferably at a point in time when corrective action could have been ordered.

While its too late to fix this problem in time to help Class Members – yet another reason why this Class should not be certified - it's not too late for Class Counsel to disclosed to this Court some helpful statistics. Namely: the number of visitors who came to the site via typing in the web address (ie – someone who saw the Notice in a magazine) versus the number of visitors who visited the site via clicking on the "hyperlink embedded in the internet banner notices" (ie – someone who saw the "Click Here for More Info" button).

Class members who click on the hyperlink won't know they're being redirected to a different site. (Presumably, the hyperlink will take the user directly to the "eclaim.kccllc.net/" site). Accordingly, these users will have less of a tendency to immediately leave the site over span/virus fears. Class Counsel can easily provide meaningful statistics to this Court regarding the type of visitor, the number of visitors, and the how many quickly they left the site.

## IV.   Notice Is Insufficient Under Rule 23 Because It Fails To Set Forth The Basis For Requested Attorneys' Fees.

Class members are entitled to the "best notice practicable under the circumstances." Fed. R. Civ. Proc. 23(c)(2)(B). The notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950); cf. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 174-175 (1974).

Though Class Counsel is requesting up to $5.68 million in fees and expenses, class members are given little information on what basis Class Counsel is making their claim. For example, if the parties expect that class members will credibly receive $56.8 million in benefits, then the resulting 10% contingency fee is eminently fair. But if the parties anticipate modest benefits, then the settlement structure was clearly designed to benefit the attorneys at the expense of the class.

But for the conflict of interest between class counsel and their clients, the defendants could have agreed to a better settlement for the class by, for example, removing or relaxing the reimbursement caps on battery packages purchased (especially for those with a proof-of-

purchase); by relaxing the proof-of-purchase requirement (ie – allowing the "proof of

purchase" printed on the back of <u>ever</u> package to actually serve as the proof-of-purchase,

rather than also requiring a merchant receipt); by offering larger reimbursements for bigger

packages (especially for those with a proof-of-purchase); and by a more robust Notice Plan.

Defendants could reasonably expect to pay the same total amount for a superior settlement if

Class Counsel had agreed to a reduction in their attorneys' fees.

Of course a more robust Notice Plan, in addition to costing more, would lead to more

claims.  Taken together, and if not properly balanced, Class Counsel fees quickly enter a

"death spiral."   Of course, that goes vice-versa.  If the Settlement Agreement allocates too

much to Class Counsel fees, it necessarily triggers a reduced Notice Plan, which leads to

fewer claims.  Call it a "reverse death spiral."

One way to avoid these death spirals is <u>full and fair disclosure</u> to the Class Members,

via the Notice, in time for them to object or opt out.  Unfortunately, <u>nothing in the Settlement</u>

<u>Notice (Doc 122-2 Exhibit C) provides any sense of what the expected benefits to the entire</u>

<u>class (sometimes referred to as the "Available Benefit") are to be</u>, though this amount surely

figured into the defendants' calculations in agreeing to this particular settlement.  More

importantly, the Available Benefit would also figure into whether a reasonable class member

would find the attorney fee request (which is, after all, a part of the Settlement) "fair,

reasonable, and adequate."

A reasonable class member might try to estimate the "Available Benefit." After

reading the Class Notice (Doc 122-2, Exhibit C) on the web-site maintained by the

Settlement Administrator ( https://eclaim.kccllc.net/caclaimforms/DUB/home.aspx ) and not

finding any helpful information on the Available Benefit, the class member might see ¶ 24

("This notice summarizes the Settlement.  More details are in the Class Action Settlement

Agreement, available at www.UltraBatteriesSettlement.com.")  Or ¶25 ("If you have

questions, call toll-free 1-855-564-7380; visit www.UltraBatteriesSettlement.com; or write to

Poertner Claims Administrator, PO Box 43224, Providence, RI 02940-3224").  But clicking

the hyperlink to www.UltraBatteriesSettlement.com doesn't take the class member to that

site - it simply circle herds the member back to where he started, as discussed more fully in

Section III.C. above.

　　　While there is at least a functioning link to the Settlement Agreement, that Agreement

doesn't contain any useful information regarding the Available Benefit.  Likewise for the

provided link to this Court's preliminary approval of the Settlement (Doc 118).

　　　The link to the Florida Third Amended Complaint (Doc 117) is valid, and it provides

information that the class member might reasonable infer was helpful in estimating the

Available Benefit.  But the information made available to the class member is misleading:

> "In 2011, the U.S. market for consumer batteries was approximately $13
> billion. Duracell's share of the global market for consumer batteries was
> approximately 25%.  Its share of the U.S. battery market has been estimated at
> 40% to 50%." (Doc 117, Florida Third Amended Complaint, ¶11 at 4)
>
> Duracell sells both primary (disposable) and secondary (rechargeable)
> batteries for use in consumer products . . ." (*Id,* ¶12)
>
> "Duracell Ultra Advanced and Ultra Power batteries retail at a substantial
> premium price over Duracell's standard CopperTop batteries and cost on
> average $0.30 more per battery (or $2.40 per eight-pack), or approximately
> 40% more than the approximate average retail price charged for the Duracell
> CopperTop. Therefore, all consumers who purchased Ultra Advanced or Ultra
> Power batteries have been injured by Defendants' deceptive marketing
> scheme and are owed restitution." ((*Id,* ¶25 at 8-9)

**Calculation 1**

From ¶11, the class member can easily calculate Duracell's sales: The US market x Duracell's share of that market, or $13 billion x 45% = $5.85 billion.

**Calculation 2**

The class member probably is familiar with the five common consumer battery size "AAA"; "AA"; "C"; "D" and "9v" and doubles that number to account for the two types of batteries (disposable and rechargeable) discussed in ¶12: 5 sizes x 2 types = 10 battery size-types.

**Calculation 3**

The class member can calculate the average annual sale per each battery size-type: $5.85 Billion Duracell's annual sales / 10 battery size-types = $585 million annual sales per each battery size-type.

**Calculation 4**

From this figure, the class member would multiple by 2 to account for sizes "AAA" and "AA" that are the subject of this class action:  $585 million x 2 = $1.17 billion per year.

**Calculation 5**

The Class Period starts "after June, 2009", so the class member would need to multiply the annual sales by 4 ½ years:  $1.17 billion per year x 4.5  years = $5.265 billion.

**Calculation 6**

The class member would then have to estimate the ratio of regular CopperTop to Ultra batteries sold.  Assume 95% of the batteries sold are CopperTop:  $5.265 billion x 5% = $263.25 million in Ultra battery sales over the class period.

**Calculation 7**

From ¶25 the Class member knows that 1.4x = $263.25 million, with x representing

the retail price of a CopperTop battery: x = $263.25 million / 1.4. Therefore, x = $188.04

million (rounded). Round further to $188 million. $188 million is the value of the Ultra

batteries purchased by the class, as valued as a CopperTop battery.

**Calculation 8**

The estimated premium paid by class members for the Ultra battery is $188 million x

40% = $75.2 million in damages.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Comparing the expected attorney fee request of $5.68 million to the estimated $75.2

million in damages yields a very reasonable 7.6% (rounded). Reasonable, but inaccurate, at

least according to information available on this court's docket. Unfortunately, the fact that

additional information was available on this court's docket via the PACER.gov website was

not disclosed to class members, either in the Class Notice or the website maintained by the

Settlement Administrator.

Specifically, the "Declaration of Robert C. Schubert in Support of Plaintiff's

Unopposed Motion for Order Preliminarily Approving Class Action Settlement Agreement

and Directing Dissemination of Class Notice" (Doc 114-2) states that:

> "The class is sufficiently numerous. Plaintiff's counsel have confirmed that
> there were approximately 7.26 million purchasers who fall within the
> Settlement Class definition." (Doc 114-2, ¶12a at 5)

[ ]

> "While counsel for the Plaintiffs in this Action and the California Action will
> provide additional information regarding the attorneys' fees requested in this
> case as part of the final approval hearing, the amount requested is reasonable

14

when compared to the overall compensation available to the Settlement Class. Indeed, the fee and expense request is less than 11.5% of the overall monetary value created for the class of approximately 7.26 million members, without inclusion of any value for the significant injunctive relief obtained." (*Id* ¶16 at 8).

### Calculation A

From ¶12, a quick (ie – high end) estimate of the Available Benefit is readily calculated: 7.26 million purchases x $3.00 per purchase = $27.8 million (rounded). This figure is a high end estimate because it does not factor in the reimbursement caps of 2 or 4 packages per household/address. It needs repeating for emphasis: this information was not made available to the Class.

### Calculation B

From ¶16, another quick (and even higher end) estimate of the Available Benefit is readily calculated: $5,680,000 / 11.5% = $49.4 million (rounded). This figure presumably includes about $5 million in *cy pres* benefits, but specifically excludes injunctive relief.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

The goal here is not to calculate the Available Benefit – its to establish that in evaluating the Settlement's fairness, a class member needs to know the Available Benefit and the amount the attorneys are to be paid. Knowing the attorney's fees, but not the Available Benefit is unacceptable. Here, not only was the Available Benefit not specifically presented to the Class, but worse, what little information that was provided, via a link to the third amended complaint (ie – Doc 114-4) was inaccurate and at odds with other information provided to the Court.

If "class counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class." Lobatz v. U.S. West

Cellular of Cal., Inc., 222 F.3d 1142, 1147 (9th Cir. 2000). But the class has been kept in the dark whether this has happened—though one can certainly draw an inference that the parties are embarrassed by the number by their failure to trumpet it to the Court in support of the settlement, much less disclose it at all.

Fed. R. Civ. Proc. 23(h)(1), added as part of the 2003 amendments to the Federal Rules, directly addresses this issue. Notice of a motion for attorneys' fees must be "directed to class members in a reasonable manner." "For motions by class counsel in cases subject to court review of a proposed settlement under Rule 23(e), it would be important to require the filing of at least the initial motion in time for inclusion of information about the motion in the notice to the class about the proposed settlement that is required by Rule 23(e). . . . In setting the date objections are due, the court should provide sufficient time after the full fee motion is on file to enable potential objectors to examine the motion." Notes of Advisory Committee on 2003 Amendments to Rule 23(h)(1). In fairness to Class Counsel, their initial request to this Court provided for a timely motion for attorney fees (ie – one that would have allowed objectors to review it before the objection deadline).

In any event the objections are due tomorrow, February 28, 2014, and no such full fee motion has been made. New notice is needed that (1) provides the full grounds of the basis of the fee request, and (2) the parties' best estimate of the value to the class of the settlement, and the factual basis for that estimate.

One last item on the attorney fee request and the need for a new notice: Plaintiff's Memorandum in Support of the Settlement (Doc 114) states that:

> "Defendants also agree to compensate settlement class members who submit a valid claim request form as follows:

> 'To each qualifying Claimant who purchased Ultra Batteries (in size AA and/or AAA), P&G will refund three dollars ($3.00) per pack, subject to the limitations described herein. [ ] Settlement Agreement at ¶ 59.'

> The $3.00 per pack payment to class members approximates the average price differential between the subject Ultra batteries and the lower-priced Duracell CopperTop.  That is, the $3.00 per pack is the approximate average price "premium" paid by consumers for each pack of Ultra AA or AAA batteries based on the average size packs purchased. [ ]"

The $3.00 per pack damages is a material higher number (ie – 20% higher) than that what was told to the Class via the link to the Third Amended Complaint:

> "Duracell Ultra Advanced and Ultra Power batteries retail at a substantial premium price over Duracell's standard CopperTop batteries and cost on average $0.30 more per battery (or $2.40 per eight-pack), or approximately 40% more than the approximate average retail price charged for the Duracell CopperTop. Therefore, all consumers who purchased Ultra Advanced or Ultra Power batteries have been injured by Defendants' deceptive marketing scheme and are owed restitution." (Doc 117 ¶25 at 8-9)

The $3.00 per pack versus $2.40 per pack could be a difference in pack size.  Admittedly, the record is not clear enough to draw a conclusion.  But the matter it is important enough to bring to the Court's attention.

## V.   The Notice Plan's reach calculation of 70.4% is not Credible and Should not be Relied Upon

In the "Declaration of Gina M. Intrepido-Bowden on Adequacy of Proposed Settlement Notice Program," (Doc 114-4) the following was stated:

> "The Notice Plan will reach at least 70.4% of Duracell Ultra Battery Users, and therefore likely Class Members, on average 1.9 times each. Coverage will be further enhanced by the notice placements in the *San Francisco Chronicle*, the *Orlando Sentinel*, and *USA Today*." (Doc 114-4 ¶27 at 11)

This declaration was based in large part on the following data from Doc 114-4 at pages 30-32:

**Summary of Consumer Magazines**
**Doc 114-4, Pages 30 thru 32 (of 64 Pages)**



| Col A | Col B | Col C | Col D | Col E | Col F | Col G |
|---|---|---|---|---|---|---|
| | As stated in Claims Administrator's Declaration Doc 114-4, Pages 30 thru 32 (of 64 Pages) | | | | As Calculated | |
| | | | % Readers are More Likely to be Duracell Ultra Battery | % of Duracell Ultra Battery | Col C * (1+Col D) / Col E | Col C / Col B |
| Consumer Magazine | Circulation | Adult Audience | Users | Users Reached | Total Adult Population | Audience to Circulation |
| Better Homes & Gdns | 7,624,505 | 37,854,000 | 15.4 | 19.0 | 229,913,242 | 5.0 |
| Ebony | 1,293,565 | 9,813,000 | 44.5 | 6.2 | 228,706,210 | 7.6 |
| Nat Geographic | 4,001,937 | 32,064,000 | 24.2 | 17.3 | 230,193,572 | 8.0 |
| People | 3,542,185 | 43,204,000 | 1.7 | 19.1 | 230,044,335 | 12.2 |
| People in Espanol | 558,823 | 2,508,000 | 23.4 | 3.7 | 83,645,189 | 4.5 |
| TV Guide | 2,021,689 | 12,826,000 | 71.3 | 9.5 | 231,273,032 | 6.3 |
| | 19,042,704 | 138,269,000 | | 74.8 | | |

ERROR #3     ERROR #1     ERROR #2

**Error 1**

Column F:  Note that most numbers cluster around the 230 million mark.  This shows an internal consistency.  It also shows a fairly reasonable consistency with U.S. census figures (see Exhibit C, attachment to Dorsey Declaration):  Population, 2013 estimate equals 316,128,239 x (1 – 23.5%) = 242 million (rounded).  Where 23.5% is the reported percent of persons under 18 years, as of 2012.

But the People in Espanol number for Total Adult Population is radically different than the 230 million.  It shows only 83,645,189.  Its clearly incorrect.  83 million is probably the number of adult minorities (ie – non-whites), not just the number of adult Hispanics (details not shown - but available on request).  Either way, its wrong, and as a result, the 3.7% number shown in column E for People in Espanol is correspondingly high

**Error 2**

See Column G: the Audience to Circulation number shown for TV Guide is, quite bluntly, ridiculously high.  There is just no other way to describe it.  The 6.3 number means that the average issue of TV Guide is seen by 6.3 adults.  Remember that column F is calculated off of Column C and is tied to the US Census data for US adults.  What the data is claiming, in effect, is that a subscriber looks at his issue of TV Guide for three days (Sunday – Tuesday)  then generously hands it off to his neighbor to read for two days (Wednesday - Thursday), who then hands it off to a co-worker for the final two days of the week (Friday Saturday).  Alternately, the original subscriber selfishly holds onto his copy of TV Guide for the entire week, then hands it off to his neighbor so that can "read" whatever articles he finds interesting.  Then ditto for the neighbor's co-worker.

19

The Settlement Administrator provides sufficient detail for where the data comes from: Gfk MediaMark Research & Intelligence, LLC (see Doc 114-4, ¶16 at 8). Footnote 5 provides the methodology used by Gfk:

> "GfK MRI is a nationally accredited research firm that provides consumer demographics, product and brand usage, and audience/exposure in all forms of advertising media. Established in 1979, MRI measures the usage of nearly 6,000 product and service brands across 550 categories, along with readership of hundreds of magazines and newspapers, internet usage, television viewership, national and local radio listening, yellow page usage, and out-of-home exposure.   Based on a yearly face-to-face interview of 26,000 consumers in their homes, MRI's Survey of the American Consumer™ is the primary source of audience data for the U.S. consumer magazine industry and the most comprehensive and reliable source of multi-media audience data available." (Doc 114-4, footnote 5 at 8).

Just from reading this footnote, two things should become clear to this court:  the 26,000 consumers are NOT a random sample of US adults. First, this is a self-selected group of people (ie - volunteers) who, quite frankly, have too much time on their hands. Certainly more time than the average consumer.  So their magazine reading habits are, in my judgement, highly skewed.  Second, and more importantly, the face-to-face interview process introduces a large "aim-to-please" attitude on the part of the interviewee, generating more skewering of the results.  This is junk science.

Here's a quick, sure-fire test for the validity of this data:  Will the presiding judge in this case sign his name to the proposition that the average issue of TV Guide is read by 6.3 adults?  If not, then this Court should not approve the Settlement (based on the entirely reasonable conclusion that the magazine reach is not anywhere near what has been presented to the Court).

Alternatively, the Court could approve the Settlement's Notice Plan based on the fact that this class is about 2-3% of the U.S. population,  that the class is widely dispersed over the entire U.S., and that the small dollar amount of the Settlement precludes trying to reach 70% of the Class (70% being just a guideline).  The Notice, as given, is therefore the best notice practicable under the circumstances.

Dorsey strongly recommends that this Court protect is own reputation and not endorse the Settlement Administrator's exaggerated reach estimates.

### Error 3

See Column E:  the Settlement Administrator declares reach numbers with absolute precision.  The declarations regarding the magazines reach have the same level of credibility as a declaration that a coin tossed 200 times "will come up heads 100 times."  Without giving a range and a "confidence level," the assertion violates the laws of probability and statistics.

## VI.   SUNSHINE IS THE BEST DISINFECTANT: RESULTS SHOULD BE MADE PUBLIC

The Settlement Agreement does not contain any provision for publicly reporting how much relief actually reached Class Members.  That public reporting is essential for any future evaluation of the fairness of the Settlement.

A vivid and tragic example of what happens without supervision of a settlement administration appears in *Moody v. Sears Roebuck and Co*, 2007 NCBC (Case no. 02 CVS 4892, New Hanover County Court North Carolina, *Order and Opinion*, May 7, 2007). Below is an excerpt from a letter that the North Carolina judge (the Honorable Ben F. Tennille) who uncovered this travesty to the Chicago judge who implemented it (*In re:*

*Lawnmower Engine Horsepower Marketing and Sales Practices Litigation* 2:08-MD-01999

US District Court, Eastern District of Wisconsin, Document 296-6):

Dear Judge Nowicki:

As a result of the notice plan and settlement in the above captioned action, the citizens of North Carolina will receive $66 in cash and coupons, and the entire nationwide class will receive cash and coupons totaling $2,402. The citizens of New Hanover County, where Mr. Moody brought suit on their behalf, will get nothing from the settlement. You will recall that plaintiffs' counsel were awarded $1,100,000 in cash and coupons for obtaining this result. There were only 997 claims filed during the claim period and only 317 of those claims were valid. There were 189 claims eligible for a $10 cash payment and 128 claims eligible for a $4 coupon, producing the $2,402 total payout. I am writing to bring these numbers to your attention for a number of reasons.

First, Mr. Shipman, lead counsel for the class, challenged me to do so. In a hearing last week on motions to dismiss the North Carolina action in Moody v. Sears, he told me that I should not make any determination of whether the judgment in Wrobel was entitled to full faith and credit without bringing my concerns to your attention first. Yielding to his request, I am taking this opportunity to again express my concerns about this settlement. Mr. Shipman told me that **he believed he had completely fulfilled his fiduciary duty to the class and was not required to notify you of the abysmal results of settlement administration or take any further action on behalf of the class he represents.** As far as he is concerned, this case is over. He is satisfied that he has earned his $1,100,000 fee by generating $2,402 for the class. Under your order, Sears has no obligation to account to you for the results of settlement administration.

Second, Mr. Shipman and Sears have gone to extremes to avoid notifying any court of the failure of the notice plan. **Your order did not require them to file any accounting in Illinois.** In North Carolina, Sears filed motions to dismiss and asked the court to hear them before obtaining any information about the settlement results. Mr. Shipman then went so far as to file a Petition for Writ of Mandamus in the North Carolina Court of Appeals, endorsed by Sears, to prevent me from having a hearing to find out the settlement results. When both attempts failed, Sears put the required information together in the attached affidavit, and Mr. Shipman said he would have given

me the information voluntarily if I had only asked for it rather than ordering it be produced. I adjourned the hearing, and the information was then produced voluntarily by Sears. You can see from the affidavit why they fought so hard to keep the information secret.

Third, and most importantly, the result is simply unjust and the type of result Congress alluded to in providing for removal of some state class actions to federal court. The public will rightly be outraged at the result. The citizens of North Carolina where this litigation originated and on whose behalf it was originally filed will undoubtedly feel wronged by the legal system. As I indicated to you in my letter of November 5, 2004, **it is my policy to make the results of all class actions public.** This case is no exception. **Sunshine is the best disinfectant.** As judges, we have to protect the integrity and public perception of the judiciary. Results like this cause the public to lose faith in the bar and the judiciary unless they are corrected (**bolding added** and all footnotes omitted).

## VII.   THIS COURT SHOULD NOT INFER SETTLEMENT APPROVAL FROM A LOW NUMBER OF OBJECTORS, ESPECIALLY WHEN THE SETTLING PARTIES HAVE ARTIFICIALLY REDUCED THE NUMBER OF OBJECTORS.

A low number of objections does not demonstrate that the settlement is fair, reasonable, and adequate. Any given class action settlement, no matter how much it betrays the interests of the class, will produce only a small percentage of objectors. The predominating response will always be apathy, because objectors – unless they can obtain pro bono counsel – must expend significant resources on an enterprise that will create little direct for themselves. See Vought v. Bank of Am., No. 10-cv-2052, 2012 U.S. Dist. LEXIS 143595, at *60 (C.D. Ill. Oct. 4, 2012) (citing, inter alia, a 1996 Federal Judicial Center survey that found between 42% and 64% of settlements engendered no filings by objectors). Another common response from non-lawyers will be the affirmative avoidance, whenever possible, of anything involving a courtroom. Class counsel may argue that this understandable tendency to ignore notices or free-ride on the work of other objectors is best

understood as acquiescence in or evidence of support for the settlement.  This is wrong.

Silence is simply *not* consent.  Grove v. Principal Mut. Life Ins. Co., 200 F.R.D. 434, 447

(S.D. Iowa 2001) (citing In re GMC Pick-Up, 55 F.3d at 789).  "Silence may be a function of

ignorance about the settlement terms or may reflect an insufficient amout of time to object.

But most likely, silence is a rational response to any proposed settlement even if that

settlement is inadequate.  For individual class members, objecting does not appear to be cost-

beneficial.  Objecting entails cost, and the stakes for individual class members are often

low."  Christopher R. Leslie, The Significance of Silence:  Collective Action Problems and

Class Action Settlements, 59 Fla. L. Rev. 71,73 (2007).

      \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

Identity of any witness to be called at the Fairness Hearing:  None.

Evidence to be presented at the Fairness Hearing:        None.

A Notice of Intent to Appear will be filed separately


Respectfully submitted:


<u>2·27·2014</u>
February 27, 2014

<u>Paul Dorsey</u>
Paul . Dorsey

# DECLARATION OF PAUL DORSEY
# IN SUPPORT OF OBJECTION

I, Paul Dorsey, declare as follows:

1.   I have personal knowledge of the facts set forth herein and, if called as a witness, could testify competently thereto.

2.   My full name is Paul Martin Dorsey.

3.   I reside at 110 Westminster Drive, West Hartford, CT  06107.  My telephone number is (860) 521-0081.

4.   I have reviewed the Settlement Class definition (see Doc 113-1, ¶ 28 § HH at 14 and ¶ 31 at 15-16) and I understand that I am a Settlement Class Member.

5.   I have not opted out of the Settlement Class.

## Original Purchase

6.   I purchased at least one package of Duracell Ultra Advanced batteries (size AA) on Monday, September 6, 2010 (a/k/a Labor Day) at the Walgreens store located at 940 Quaker Lane South, West Hartford, CT  06110.

7.   I did not save the receipt, but I remember this purchase from some 3 ½ years ago because at the time I was the primary care giver for my mother.  I needed the "AA" batteries to power several combination digital clock/thermometer/calendar devices that I had recently acquired.  Winter was coming on and I needed these fairly special devices in each room of the house to ensure my mother would be warm and comfortable.

8.   When I buy batteries, I don't buy generic "store" brands.  Ever.  I believe there is too much of a chance that the batteries will be stale.

9.      As a native Nutmegger, when I buy name-brand batteries, I buy Duracell.  By

information and belief, Duracell is headquartered in Connecticut.

10.     As a rule, I normally don't buy Duracell's premium batteries.  I believe there

is too much of a price premium over regular batteries.  Duracell's regular

battery – the CopperTop - is what I usually buy.

11.     But due to the fact that I was buying batteries to help me take care of my

mother, I did something I normally don't do: I purchased Duracell's premium

battery.

12.     Based upon my review of Doc 75, page 6 of 17, the Duracell premium

batteries that I purchased were the "Ultra Advanced" batteries.

### Recent Purchase

13.     Annexed hereto as Exhibit A is a true and correct copy of an invoice from my

purchase on February 17, 2014 of a package of Duracell Ultra Power (size

AA) batteries from internet retailer Amazon.com.

14.     Annexed hereto as Exhibit B is a true and correct copy of an invoice from my

purchase on February 17, 2014 of a package of Duracell Ultra Power (size

AAA) batteries from internet retailer Amazon.com.

### Other Items

15.     On several occasions in early February, 2014, the last occasion being

February 27, 2014, I visited, or more accurately, attempted to visit, the

website www.UltraBatterySettlement.com. I was automatically redirected to

another website https://eclaim.kccllc.net/caclaimforms/DUB/home.aspx.

16.     Upon very careful review, to the best of my knowledge and belief, I could not

locate any hyperlink or tab to a Spanish language version of this web-site.

17.     Annexed hereto as Exhibit C is a true and correct copy, as of February 27,

2014, of a three page printout of a web page maintained by the U.S. Census

Bureau: http://quickfacts.census.gov/qfd/states/00000.html.


    I declare under penalty of perjury of the laws of the United States of America that the

foregoing is true and correct.


Executed on Feb 27, 2014, in West Hartford, Connecticut.

_____

Paul Dorsey