**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| JOSHUA D. POERTNER, Individually and on behalf of all others similarly situated; | ) ) |
| | ) CASE NO: 6:12-CV-00803-GAP-DAB |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE GILLETTE COMPANY, and | ) |
| THE PROCTER & GAMBLE COMPANY; | ) |
| | ) |
| Defendants. | ) |

**OBJECTION AND MEMORANDUM OF LAW**
**IN SUPPORT OF OBJECTION TO PROPOSED SETTLEMENT**

# TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................. 1

II.  THE OBJECTOR IS A MEMBER OF THE CLASS ........................................ 2

III.  RELIEF REQUESTED ......................................................................................... 2

IV.  THE ACTUAL VALUE OF THE SETTLEMENT ........................................... 2

    A.  Value to the Class ........................................................................................ 3

        1. Cash Payments to Class Members .................................................. 3

        2. The Value of the *Cy Pres* Payments ............................................. 4

        3. The prospective and Injunctive relief ........................................... 9

    B.  Value to Proposed Class Counsel ............................................................ 10

V.  THE COURT SHOULD GRANT LEAVE TO RESPOND TO PLAINTIFF'S
MOTIONS FOR FINAL APPROVAL AND ATTORNEYS' FEES ............................. 10

VI.  THE COURT SHOULD DECLINE TO APPROVE THE SETTLEMENT AND
SHOULD DENY THE MOTION FOR ATTORNEYS' FEES ...................................... 11

    A.  Plaintiff Has Failed to Demonstrate that the Class Recovery is Fair,
Reasonable and Adequate .......................................................................... 12

    B.  The Plan of Allocation is Unreasonable ................................................... 13

    C.  The Court Should Not Approve the Requested Attorneys' Fee ............... 14

        1. The Requested Attorneys' Fees are Unreasonable Under the Percentage of
Recovery Method ........................................................................... 15

        2. The Lodestar Method is More Appropriate to Analyze the Reasonableness of
Attorneys' Fees in a Claims Made Settlement .............................. 19

        3. The "Separate Negotiation" of the Fee With the Defendants Does Not
Change the Required Analysis ....................................................... 20

    D.  The Excess Fee Should be Re-allocated to Class Members ..................... 21

    E.  The Notice Sent to Class Members Was Defective ................................... 22

VII.  CONCLUSION ................................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**

   **Page(s)**

*Allapattah Servs. v. Exxon Corp.*,
   454 F. Supp. 2d 1185 (S.D. Fla. 2006) ...................................................................... 16

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)..................................................................................... 11, 22

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980)....................................................................................... 16, 18

*Bonner v. City of Prichard*,
   661 F.2d 1206 (11th Cir. 1981) ............................................................................. 14

*Brazil v. Dell Inc.*,
   2012 U.S. Dist. LEXIS 47986 (N.D. Cal. Apr. 4, 2012) ........................................... 17

*Camden I Condo. Ass'n, Inc. v. Dunkle*,
   946 F.2d 768 (11th Cir. 1991) ............................................................................... 15

*Class Plaintiffs v. City of Seattle*,
   955 F.2d 1268 (9th Cir 1992) ................................................................................ 13

*Duhaime v. John Hancock Mutual Life Insurance Company*,
   989 F.Supp. 375 (D.Mass.1997) ............................................................................ 18

*Ehrheart v. Verizon Wireless*,
   609 F.3d 590 (3d Cir. 2010)............................................................................ 12, 15

*Eppard v. ViaQuest, Inc.*,
   2010 U.S. Dist. LEXIS 122769 (S.D. Ohio Nov. 2, 2010).................................. 15, 16

*Fid. & Casualty Co. v. O'Shea*,
   397 So. 2d 1196 (Fla. Dist. Ct. App. 2d Dist. 1981).................................................. 17

*Fresco v. Auto. Directions, Inc.*,

2009 U.S. Dist. LEXIS 125233 (S.D. Fla. Jan. 16, 2009) ......................................... 21

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ............................................................... 11

*Helmich v. Kennedy*,
    796 F.2d. 1441 (11th Cir. 1986) ............................................................ 12

*Holman v. Student Loan Xpress, Inc.*,
    778 F. Supp. 2d 1306 (M.D. Fla. 2011) .................................................... 19

*In re Airline Ticket Comm'n Antitrust Litig.*,
    268 F.3d 619 (8th Cir. 2001) ................................................................. 7

*In re Bankamerica Corp. Sec. Litig.*,
    210 F.R.D. 694 (E.D. Mo. 2002) ............................................................ 14

*In re Excess Value Ins. Coverage Litig.*,
    598 F. Supp. 2d 380 (S.D.N.Y. 2005)....................................................... 15

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)............................................................ 19, 20, 22

*In re Motorsports Merch. Antitrust Litig.*,
    160 F. Supp. 2d 1392 (N.D. Ga. 2001) ...................................................... 8

*In re Oracle Sec. Litig.*,
    1994 U.S. Dist. LEXIS 21593 (N.D. Cal. June 16, 1994) ............................... 13

*In re Packaged Ice Antitrust Litig.*,
    2011 U.S. Dist. LEXIS 150427 (E.D. Mich. Dec. 13, 2011)............................. 4

In *re TJX Companies Retail Sec. Breach Litig.*,
    584 F. Supp. 2d 395 (D. Mass. 2008) ................................................. 16, 18

*In re: Infant Formula Multidistrict Litig.*,
    2005 U.S. Dist. LEXIS 32957 (N.D. Fla. Sept. 8, 2005)................................. 7

*Johnson v. Georgia Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ................................................................ 16

- iii -

*Knight v. United States*,
    982 F.2d 1573 (Fed. Cir. 1993)............................................................... 17

*Lepinske v. Mercedes Homes, Inc.*,
    2008 U.S. Dist. LEXIS 111166 (M.D. Fla. July 7, 2008)........................... 19

*Mercury Interactive Corp. Sec. Litig. v. Mercury Interactive Corp.*,
    618 F.3d 988 (9th Cir. 2010) ................................................................... 11

*Michel v. WM Healthcare Solutions, Inc.*,
    2014 U.S. Dist. LEXIS 15606 (S.D. Ohio Feb. 7, 2014).............................. 4

*Moore v. Verizon Communs., Inc.*,
    2013 U.S. Dist. LEXIS 170027 (N.D. Cal. Nov. 27, 2013)........................ 16

*Nachshin v. AOL, LLC*,
    663 F.3d 1034 (9th Cir. 2011) .................................................................. 8

*Parker v. Time Warner Entm't Co., L.P.*,
    631 F. Supp. 2d 242 (E.D.N.Y. 2009) ...................................................... 15

*Pearson v. NBTY, Inc.*,
    2014 U.S. Dist. LEXIS 357 (N.D. Ill. Jan. 3, 2014) .................................. 10

*Perkins v. Am. Nat'l Ins. Co.*,
    2012 U.S. Dist. LEXIS 95039 (M.D. Ga. July 10, 2012)............................. 8

*Piambino v. Bailey*,
    610 F.2d 1306 (5th Cir. 1980) ................................................................. 14

*Piambino v. Bailey*,
    757 F.2d 1112 (11th Cir. 1985) ............................................................... 12

*Rohn v. Tap Pharm. Prods. (In re Lupron Mktg. & Sales Practices Litig.)*,
    677 F.3d 21 (1st Cir. 2012)........................................................................ 7

*State of Fla. v. Dunne*,
    915 F.2d 542 (9th Cir. 1990) ................................................................... 15

*Strong v. BellSouth Telecomms., Inc.,*
137 F.3d 844 (5th Cir. 1998) .................................................................. 17, 18, 21, 22

*Sylvester v. CIGNA Corp.,*
369 F. Supp. 2d 34 (D. Me. 2005) ................................................................ 4

*Thorogood v. Sears, Roebuck & Co.,*
547 F.3d 742 (7th Cir. Ill. 2008)................................................................ 22

*Torres v. Bank of Am. (In re Checking Account),*
830 F. Supp. 2d 1330 (S.D. Fla. 2011) ...................................................... 8

*Turner v. Murphy Oil USA, Inc.,*
472 F. Supp. 2d 830 (E.D. La. 2007) ........................................................ 21

*Waters v. Int'l Precious Metals Corp.,*
190 F.3d 1291 (11th Cir. 1999) ................................................... 1, 16, 17, 21

*Weber v. Gov't Emples. Ins. Co.,*
262 F.R.D. 431 (D.N.J. 2009)................................................................... 19

*Weinberger v. Great Northern Nekoosa Corp.,*
925 F.2d 518 (1st Cir. 1991)............................................................... 19, 20

*Yeagley v. Wells Fargo & Co.,*
2008 U.S. Dist. LEXIS 5040 (N.D. Cal. Jan. 18, 2008),
*rev'd on other grounds*, 365 Fed. Appx. 886 (9th Cir. Cal. 2010) .............................. 2

*Zimmer Paper Products, Inc. v. Berger & Montague, P.C.,*
758 F.2d 86 (3d Cir. 1985)........................................................................ 4

**Other Authorities**
**Page(s)**

*Am. Law Inst., Principles of the Law of Aggregate Litigation* § 3.07 ...................................... 7

*Manual for Complex Litigation (Fourth)*, § 21.7.................................................................. 21

*Manual for Complex Litigation (Fourth)* § 21.61............................................................ 12, 15

*Manual for Complex Litigation (Fourth)* § 21.71................................................................ 14

*2 McLaughlin on Class Actions* § 6:24 (8th ed.) .................................................................. 4

**Rules**

Fed.R.Civ.P. 23(c)(2)......................................................................................... 22

Fed. R. Civ. P. 23(e) ............................................................................... 11, 12, 22

Fed. R. Civ. P. 23(h) .................................................................................. 11, 14

## I.   INTRODUCTION

Courts are required to carefully analyze class action settlements because the inherent conflict of interest between a class and class counsel when making a request for attorneys' fees often results in counsel structuring the terms of settlements, or assigning values to these settlements, in such a way to make the settlement appear to be larger than it is in order to justify a large attorneys' fee.[1]

In this case, class counsel has negotiated a settlement that they describe as having an "overall monetary value" of approximately $50 million, including: 1) cash payments to Class Members on a "claims-made" basis; 2) a $6 million *cy pres* benefit; and 3) attorneys' fees and expenses of approximately $5.7 million.   In addition to this $50 million in "overall monetary value," class counsel also claims to have secured "valuable" prospective and injunctive relief.   Pursuant to these benefits, the requested attorneys' fee of approximately $5.7 million appears to be a "reasonable" 11.5% of the "overall monetary value."

However, as described herein, *the actual value of the Settlement is only a tiny fraction of the claimed amount.*   While the cash value of the "claims made" payments cannot be precisely estimated, the historical results of the administration of consumer class action settlements suggest that the Defendants will likely end up making less than $2.3 million in "claims-made" payments.   Further, the "benefits" of the *cy pres* payments and injunctive relief are entirely illusory.   In total, the actual value of the Settlement will likely be a maximum of $8 million, consisting of $2.3 million in payments to the Class and $5.7 million in attorneys' fees.

---

[1]  *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999) (noting that the values attached to "many" class action settlement funds are "illusory" or "meaningless")

- 1 -

By artificially inflating the purported value of the Settlement, proposed class counsel hopes to gain approval of a shocking $5.7 million attorneys' fee – a fee that – in reality -- is likely several multiples of the total benefit that will actually be received by the Class.   The Court should disregard the illusory and overstated value of the Settlement to the Class when determining the reasonableness of this requested fee, and the reasonableness of the Settlement as a whole.   When the actual value of the Settlement is considered, both the Settlement and the requested fee are not "fair and reasonable" and should be rejected.[2]

## II.   THE OBJECTOR IS A MEMBER OF THE CLASS

Jeanne Ann Gaspar (the "Objector") purchased the required Duracell batteries, and is thus a member of the proposed Class and thereby entitled to make this objection. (Mrs. Gaspar's Declaration is attached hereto).

## III.   RELIEF REQUESTED

The Objector respectfully requests this Court for: 1) Leave to file a response to Plaintiffs' Motions for Final Approval and for Attorneys' Fees, both of which will be filed after the deadline for this objection; and 2) an Order denying final approval of the settlement; and 3) on Order denying the motion for attorneys' fees.

## IV.   THE ACTUAL VALUE OF THE SETTLEMENT

The Notice, Motion for Preliminary Approval and the Settlement Agreement each describe the basic terms of the Settlement: 1) a cash payment of $3.00 per pack of batteries purchased by class members filing a claim form; 2) *cy pres* relief of $6 million; 3) prospective and injunctive relief; and 4) attorneys' fees and expenses of $5,680,000.

---

[2]  *See, e.g. Yeagley v. Wells Fargo & Co.*, 2008 U.S. Dist. LEXIS 5040 at *20-21 (N.D. Cal. Jan. 18, 2008), *rev'd on other grounds*, 365 Fed. Appx. 886 (9th Cir. Cal. 2010) (court is not required to "adopt the fiction" that the settlement is worth the maximum amount that could possibly be paid if all class members were to make claims in a claims-made settlement.)

- 2 -

Although the Notice does not quantify the aggregate value of the Settlement, Paragraph 15 of the Lowe Dec. (Docket No. 114-1) provides the wholly unsupported assertion that the requested fee of $5,680,000 "is less than 11.5% of the overall monetary value created for the class, without inclusion of any value for the significant injunctive relief obtained," thus valuing the Settlement at approximately $49,391,304.[3]

For the following reasons, the Objector believes this to be a wild overstatement of the actual value of the Settlement.   The actual value of the Settlement is likely between $1.5 million and $2.3 million for the Class and $5.7 million for class counsel.

### A.  Value to the Class

The aggregate value of all of the benefits that will be received by Class Members cannot be estimated with precision because of the nature of the settlement as a "claims made" settlement rather than a common fund of a fixed amount.   However, a reasonable estimate of the actual aggregate value to Class Members is somewhere between $1.5 million and $2.3 million, consisting entirely of the value of the $ cash payments that will be made to class members filing a valid claim form.   The alleged value of both the *cy pres* program and the injunctive relief are entirely illusory, and neither provide any cognizable value to the Class.

### 1.      Cash Payments to Class Members

The total value of the $3.00 payments to class members can be estimated at between $1,533,312 and $2.299,968, based upon information disclosed by class counsel, the settlement administrator and the historical response rates of consumer class actions.   Class members are entitled to receive $3.00 per pack (regardless of the number of batteries in the pack) of either AA or AAA batteries purchased during the Class Period, subject to a

---

[3]  $49,391,304 = $5,680,000 / 11.5%.

- 3 -

maximum of either two packs (if the claim form is submitted without receipts) or four packs (if the claim form is submitted with receipts).    Docket No. 114 at 8; Settlement Agreement ¶ 59.    The Lowe Dec. ¶ 12(a) (Docket No. 114-1) identifies <u>7.26 million class members</u>[4], and the McComb Dec. ¶ 11 (Docket No. 122) testifies that the Notice Plan is calculated to reach <u>70.4% of these class members</u>, resulting in a total of <u>5,111,040 class members receiving notice</u> of the Settlement.[5]    If each and every one of these noticed class members filed their claim forms, the total payments to class members would be $15,333,120.    However, such a result would be unprecedented, and numerous courts have recognized that, of those class members that actually receive the notice, a 10-15% response rate is typical in a consumer class action.    *See, e.g. Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 52 (D. Me. 2005) ("'[C]laims made' settlements regularly yield response rates of 10 percent or less.")[6]

There has been no evidence submitted that the Settlement will be able to reach the typical 10-15% response rate, but even if it does, <u>the total cash payments to class members will likely be between $1,533,312 and $2,299,968.</u>

### 2.    The Value of the *Cy Pres* Payments

The alleged value of *cy pres* payments contemplated by the Settlement to be paid to various unnamed charities should be entirely disregarded reduced by the Court in assessing

---

[4]   The Objector assumes that this means that 7.26 million packs of Ultra Batteries were sold, because proposed Class counsel could have no way of knowing how many separate purchasers bought packs of Ultra Batteries.

[5]   7,260,000 x 70.4% = 5,111,040.

[6]   *See also 2 McLaughlin on Class Actions* § 6:24 (8th ed.) ("Claims-made settlements typically have a participation rate in the 10-15 percent range"); *Zimmer Paper Products, Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 92-93 (3d Cir. 1985)( a response rate of 12% was "in line with the response rates in similar settlements); *Michel v. WM Healthcare Solutions, Inc.*, 2014 U.S. Dist. LEXIS 15606 (S.D. Ohio Feb. 7, 2014)(class counsel noted that they typically receive a response rate of 10-15% in TCPA class action litigation); *In re Packaged Ice Antitrust Litig.*, 2011 U.S. Dist. LEXIS 150427 at *61 (E.D. Mich. Dec. 13, 2011)(the response rate of claims filed to notices mailed is "frequently less than 5%).

the value of the Settlement to class members because: 1) the alleged value of the payments is entirely illusory; and 2) the donation scheme does not legally quality as a *cy pres* distribution.

*First*, the alleged *cy pres* benefits obtained by the Settlement appear to be entirely illusory.   Pursuant to the terms of the Settlement, the Defendants agreed to make an in-kind payment of $6 million of Duracell products (at retail value) over a five year period to unidentified "charitable organizations" that might include first responders and the Toys for Tots program.   Settlement Agreement at ¶ 61.   However, this provision appears to merely take credit for an ongoing program of charitable contributions that would have occurred with or without the Settlement.   To their credit, Duracell makes – year in and year out – substantial contributions to various charities in the form of Duracell products.   Indeed, Duracell has made substantial in-kind contributions to various first responder charitable organizations and Toys for Tots and similar programs each year <u>since at least January 2011</u>.

For example, in a January 31, 2011 press release, Duracell "kicked off a national battery donation program" known as the "Power Those Who Protect Us" program with the goal of donating "10 million batteries to the 23,000 volunteer fire departments in the U.S."[7] Similarly, in a August 5, 2013 press release, Duracell disclosed that it was donating one million of its new Quantum batteries to first-responders throughout North America.[8]

---

[7] *The National Volunteer Fire Council and Duracell Launch Battery Donation Program to Help Power 23,000 Volunteer Fire Departments across the U.S.*, Press release dated January 31, 2011 (attached as Exhibit A to the Declaration of Michael T. Harrison (the "Harrison Dec.")).   This press release is also available at: http://news.duracell.com/press-release/power-those-who-protect-us/national-volunteer-fire-council-and-duracell -launch-battery

[8] *Duracell® Introduces Quantum™ the World's Most Advanced Alkaline Battery with One Million Battery Donation to First Responders across North America*, Press release dated Aug. 15, 2013.   A copy is attached as Exhibit B to the Harrison Dec.   Also available at: http://news.duracell.com/press-release/quantum/duracell-introduces-quantum-worlds-most-advanced-alkaline-b attery-one-million-

- 5 -

Likewise, Duracell has a history of donating substantial amounts of its products to the Toys for Tots program and similar programs in recent years.   For example, a November 22, 2011 press release details that Duracell would contribute 30,000 batteries to the "Toy Industry Foundation (a program similar to Toys for Tots) to power holiday toys for kids in need."[9]   The next year, a November 21, 2012 press release announced that Duracell had agreed to donate a large number of batteries to the Toys for Tots program.[10]   Again, on November 22, 2013, Duracell issued a press release reporting that it was donating up to 1 million batteries to Toys for Tots during the 2013 holiday season.[11]

Plainly, Duracell has decided that it is either good business or a corporate responsibility to support the first responders and Toys for Tots, and has made sizeable donations of Duracell products to them since at least January 2011. Based on their donation programs since at least the beginning of 2011, it appears certain that the Defendants would make a total contribution of $6 million in products to first responders, Toys for Tots or other charitable organizations over the next five years whether this Settlement was entered into or not.   There is absolutely no indication that the Settlement increased the amount that

---

[9]  *Duracell Launches the Holiday Insurance Program to Ensure a Magical Christmas Morning for Families*, press release dated Nov. 22, 2011.   A copy of this press release is attached as Exhibit C to the Harrison Dec. This press release is also available at:
http://news.duracell.com/press-release/holiday-programs/duracell-launches-holiday-insurance-program-ensure-magical-christmas-

[10]  *Duracell Powers Holiday Smiles for Children in Need This Season with Toys for Tots*, press release dated Nov. 21, 2012.   A copy of this press release is attached as Exhibit D to the Harrison Dec.   This press release is also available at:
http://news.duracell.com/press-release/duracell-corporate/duracell-powers-holiday-smiles-children-need-season-toys-tots

[11]  *Duracell® to Donate up to 1 Million Batteries to Toys for Tots This Holiday*, press release dated Nov. 22, 2013.   A copy of this press release is attached as Exhibit E to the Harrison Dec.   This press release is also available at:
http://news.duracell.com/press-release/holiday-programs/duracell-donate-1-million-batteries-toys-tots-holiday

Duracell would contribute to the first responders, Toys for Tots or any other charity. Accordingly, these charitable contributions were not the result of concessions forced by the Settlement, but are almost certainly nothing more than class counsel claiming credit for an ongoing corporate charitable contribution program.[12]

   *Second*, the proposed contributions to first responders, Toys for Tots or the other similar unnamed charities do not meet the legal requirements to be properly considered a *cy pres* distribution.[13]   The *cy pres* doctrine takes its name from the Norman French expression, "*cy pres comme possible*", which means "as near as possible."   *In re: Infant Formula Multidistrict Litig.*, 2005 U.S. Dist. LEXIS 32957 at *2-3 (N.D. Fla. Sept. 8, 2005) (*citing In re Airline Ticket Comm'n Antitrust Litig.*, 268 F.3d 619, 625 (8th Cir. 2001)).   *Cy pres* payments are not appropriate as a <u>substitute</u> for paying class members, but should be employed only to donate <u>residual funds</u> after the initial distribution when "the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair."   *Rohn v. Tap Pharm. Prods. (In re Lupron Mktg. & Sales Practices Litig.)*, 677 F.3d 21, 32-33 (1st Cir. 2012)(*citing Am. Law Inst., Principles of the Law of Aggregate Litigation* § 3.07).[14]

---

[12]  To be clear, Objector greatly admires the work of these organizations, and applauds Duracell for its ongoing contributions to these and similar worthy programs since at least 2011.   The Objector takes issue, however, with proposed class counsel's cynical and misleading attempt to take credit for this ongoing corporate program of charitable contributions as somehow being a "benefit" of the Settlement and therefore purportedly increasing the monetary benefit the proposed class counsel obtained for the Class.

[13]  Additionally, compliance with this term appears to be left to the discretion of the Defendants, with no ability (or desire) of the Putative Class Counsel to monitor any such distributions.   It is far from clear how, or whether, proposed class counsel will monitor such distributions to make sure that they comply with the Settlement Agreement.

[14]  The use of *cy pres* to distribute settlement funds is "controversial" even in the context of unclaimed residual settlement funds.   *In re Airline Ticket Comm'n Antitrust Litig.*, 268 F.3d at 625.

"It is not uncommon in consumer class actions to have funds remaining after payment of all identifiable claims." *In re Motorsports Merch. Antitrust Litig.*, 160 F. Supp. 2d 1392, 1393 (N.D. Ga. 2001). In such a situation, courts have often exercised their equitable powers to allow the excess funds to be distributed <u>to organizations geared toward "combating harms similar to those that injured the class members.</u> Such a donation may serve the *cy pres* principle of indirectly benefitting all class members." *Id.* at 1394. Here, the contemplated *cy pres* distribution of $6 million is contemplated to be paid to the charities <u>instead of to class members,</u> from funds that are not residual remainders of the initial distribution. This is an inappropriate use of the cy pres vehicle. *Id.*

Further, the proposed distributions to first responders and Toys for Tots are improperly considered a *cy pres* distribution comprising a benefit of the Settlement because they provide no legally cognizable benefit to the putative class because they are not "distributed for a purpose <u>as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members,</u> and the interests of those similarly situated." *Torres v. Bank of Am. (In re Checking Account)*, 830 F. Supp. 2d 1330, 1355 (S.D. Fla. 2011)(emphasis added); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1040 (9th Cir. 2011) (rejecting, in a nationwide privacy class action, a *cy pres* distribution to local Los Angeles charities because it did not "account for the broad geographic distribution of the class," did not "have anything to do with the objectives of the underlying statutes," and would not clearly "benefit the plaintiff class."); *Perkins v. Am. Nat'l Ins. Co.,* 2012 U.S. Dist. LEXIS 95039 at *10 (M.D. Ga. July 10, 2012) (approving *cy pres* distribution to law schools and consumer law foundations in a consumer fraud class action.)

For the above stated reasons, <u>there is no legally recognizable benefit to the Class from the battery donation programs</u>.

### 3. The prospective and Injunctive relief

The purported "benefit" of the prospective or injunctive relief claimed by the Notice is illusory because, while the terms of the Settlement provide for such future relief, it limits the application to items that are no longer manufactured.   In short, <u>the alleged "prospective and injunctive relief" applies to absolutely no currently manufactured products</u>.[15]

The Notice discloses that one of the "Settlement Benefits" is the injunctive relief that the Plaintiff was able to obtain to force the Defendants to discontinue making statements regarding the Ultra Advanced or Ultra Power batteries that the Plaintiff contends are misleading:

> In addition, Defendants have agreed to stop packaging and displaying Duracell Ultra Batteries in the United States using the advertising statements at issue in these lawsuits.   The Defendants will also stop using these statements on their North American website, www.duracell.com

However, pursuant to the terms of the Settlement Agreement itself, the prospective remedial/injunctive relief described in the Notice does not apply to Ultra Batteries packed prior to the "Start Date" (which is defined as 60 days after the "Effective Date," which is itself defined as 35 days after final approval (if no appeal is taken)). Settlement Agreement ¶ 58.   Thus, the above described injunctive relief <u>does not apply to any Ultra Batteries that were or will be packaged prior to June 24, 2014 (95 days *after* the final approval hearing.</u>

---

[15] Ultra Batteries are no longer listed as a Duracell product on its website, with Duracell Quantum appearing to be the new premium brand.   http://www.duracell.com/en-us/products.   Likewise, Duracell Ultra Batteries are no longer available online through major retailers such as Target and Wal-Mart.

- 9 -

This professed "benefit" is entirely illusory because <u>Duracell discontinued making and packaging Ultra Batteries sometime in 2013</u>.   Indeed, a NEW YORK TIMES article reported by July 22, 2013 that that the Duracell Ultra line of batteries was being discontinued.[16]   Duracell's website no longer lists Ultra Batteries as one of its products.[17] Accordingly, since Duracell no longer makes or packages Ultra Batteries, it will not be packing them after June 24, 2014, so this "concession" <u>will not apply to anything</u>, rendering the alleged injunctive relief "benefit" to be entirely worthless.[18]

### B.  Value to Proposed Class Counsel

The value of the Settlement to class counsel, however, is not hard to calculate, calling for a cash payment of $5,680,000 to be paid directly to class counsel from the Defendants.

## V.   THE COURT SHOULD GRANT LEAVE TO RESPOND TO PLAINTIFF'S MOTIONS FOR FINAL APPROVAL AND ATTORNEYS' FEES

The Objector requests leave to file a response to Plaintiff's motion for final approval of settlement and approval of attorneys' fees.   Section IV of the Motion for Preliminary Approval ("The Proposed Schedule of Events") proposed a schedule for the final approval process whereby the Plaintiff promised to file its "papers in support of Final Approval and Class Counsel's Application for Attorney's Fee and Expenses" ten days in advance of the

---

[16]  Newman, *Duracell Offers Praise, and Power, for Everyday Heroes*, NEW YORK TIMES (July 22, 2013)("Now Duracell, the Procter & Gamble brand, is introducing a line of batteries, Quantum, that will be its most powerful, and which will come at a premium, with a suggested retail price 20 percent to 30 percent higher than the Copper Top. (Another premium battery line, Duracell Ultra, which is priced the same as Quantum, will be discontinued."))   A copy of this article is attached as Exhibit E to the Harrison Dec., and is also available on the New York Times website at:
http://www.nytimes.com/2013/07/23/business/media/duracell-offers-praise-and-power-for-everyday-heroes.html?_r=0.

[17]  See http://www.duracell.com/en-us/category/all-purpose-batteries.

[18]  Even if the injunctive relief did apply to any actual products, it would not provide a direct benefit to the Class, but instead to the general public and future Duracell purchasers.   *Pearson v. NBTY, Inc.*, 2014 U.S. Dist. LEXIS 357 at *14 (N.D. Ill. Jan. 3, 2014).

deadline for objections.[19]    However, the Order entered by the Court on November 5, 2013

allowed Plaintiff to file its motion <u>after</u> the deadline to object.[20]

Rule 23(h)(2) specifically provides that "a class member . . . may object to the

motion" for attorneys' fees."    Further, Rule 23(h)(1) requires that "notice of the motion

must be . . . directed to class members in a reasonable manner."    Filing the motion after the

deadline for objections does not provide notice "in a reasonable manner."    A "schedule that

requires objections to be filed before the fee motion itself borders on a denial of due process

because it deprives objecting class members of a full and fair opportunity to contest class

counsel's fee motion."    *Mercury Interactive Corp. Sec. Litig. v. Mercury Interactive Corp.,*

618 F.3d 988, 993 (9th Cir. 2010).    Accordingly, the Objector specifically requests leave to

file a response to the motion for attorneys' fees and the final approval of settlement.

## VI.    THE COURT SHOULD DECLINE TO APPROVE THE SETTLEMENT AND SHOULD DENY THE MOTION FOR ATTORNEYS' FEES

Fed.R.Civ.P. 23(e) provides that a proposed settlement may only be approved after a

"finding that it is fair, reasonable, and adequate."    The Settling Parties have failed to carry

their burden to demonstrate that the settlement is fair and reasonable.    Where a court is

confronted with a settlement-only class certification, the court must look to factors "designed

to protect absentees." *Amchem Prods., Inc. v. Windsor*, 521U.S. 591, 620 (1997).    "These

concerns warrant special attention when the record suggests that settlement is driven by fees;

that is, when counsel receive a disproportionate distribution of the settlement, or when the

class receives no monetary distribution but class counsel are amply rewarded." *Hanlon v.*

*Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998).    As described below, this type of

---

[19]  Docket No. 114, p. 25.

heightened scrutiny is merited with respect to this proposed settlement, where proposed class

counsel would be receiving a disproportionate share of the settlement proceeds.   The Court

should decline to approve the settlement because: A) Plaintiff has not demonstrated that the

terms of the settlement are fair and reasonable; B) the plan of allocation is unreasonable; C)

the requested attorneys' fees are excessive; and D) the Class Notice was defective.

### A. Plaintiff Has Failed to Demonstrate that the Class Recovery is Fair, Reasonable and Adequate

Pursuant to Fed.R.Civ.P. 23(e), the Court "has a heavy duty to ensure that any

settlement is 'fair, reasonable, and adequate.'" *Piambino v. Bailey*, 757 F.2d 1112, 1139 (11th

Cir. 1985).   This review "must be exacting and thorough" because the adversarial nature of

such litigation is often lost once the named plaintiff and the defendants decide to settle and

"the settling parties frequently make a joint presentation of the benefits of the settlement

without significant information about any drawbacks." *Ehrheart v. Verizon Wireless*, 609

F.3d 590, 604 (3d Cir. 2010)(citing *Manual for Complex Litigation (Fourth)* § 21.61).

Although the Plaintiff has identified "overall monetary benefits" of $50 million to the

Class, he has not met his burden of making such a showing.     Plaintiff has likewise not met

his burden of demonstrating that $3.00 per pack is a "fair, reasonable and adequate"

settlement.   Plaintiff's Motion for Preliminary Approval cites no damage analysis, market

studies or other expert opinion related to the reasonableness of this $3.00 damage figure,

instead relying on the unsupported assertion of counsel that $3.00 "approximates" the

average damages suffered by the class members per pack of batteries purchased.[21]

---

[20]  Docket No. 118, p. 10.

[21]  Docket No. 114 at 8.   Unsupported statements of fact in a party's brief should not be considered.   *Helmich v. Kennedy*, 796 F.2d 1441, 1443 (11th Cir. 1986).

**B.  The Plan of Allocation is Unreasonable**

Approval of a plan of allocation of settlement proceeds in a class action under Fed. R.

Civ. P. 23 is governed by the same standards of review applicable to approval of the

settlement as a whole: the plan must be fair, reasonable and adequate. *Class Plaintiffs v. City*

*of Seattle*, 955 F.2d 1268, 1284-85 (9th Cir 1992).    A plan of allocation that reimburses

class members based on the extent of their injuries is generally considered to be reasonable.

*In re Oracle Sec. Litig.*, 1994 U.S. Dist. LEXIS 21593 at *3 (N.D. Cal. June 16, 1994).

There were many different sizes of packs of both AA and AAA batteries sold to class

members during the class period.    Indeed, a quick search on the Amazon.com website

identifies that Duracell Ultra batteries were recently sold in packs of 4 (for $7.99), 8 (for

$7.71), 16 (for $12.75) and 30 (for $22.89).[22]    The plan of allocation announced in the

Settlement provides for a payment of $3.00 per pack of batteries purchased, <u>regardless of the</u>

<u>number of batteries in the pack that was purchased</u>.    It may be (as Plaintiff has claimed

without support) that the "average" price of a pack of Duracell Ultra Batteries (of all sizes)

was subject to a $3.00 premium over the "Copper Top" batteries, but it is unlikely that the

"premium" or damages for a purchaser of a 30 pack are the same as the damages to the

purchaser of a package of just four batteries.    Class members that purchased larger packs

may have lost significantly more than $3.00.    The plan of allocation awarding the same

recovery to all purchasers regardless of the size of the packs that they purchased does not

compensate class members based on the extent of their injuries, and is thus unfair and

unreasonable, and should be rejected.    *In re Bankamerica Corp. Sec. Litig.*, 210 F.R.D. 694,

---

[22]  See Harrison Dec., Exhibit F.    This appears to be various vendors selling their existing stock of this
discontinued product, so the prices may well be different than the retail amounts charged prior to the
discontinuation of Ultra batteries in 2013.

- 13 -

709-12 (E.D. Mo. 2002)(rejecting final approval of settlement because the plan of allocation was "not fair reasonable or adequate.")

### C. The Court Should Not Approve the Requested Attorneys' Fee

The Court must assess the reasonableness of the attorneys' fees in order to "protect the nonparty members of the class from unjust or unfair settlements affecting their rights" as well as to minimize conflicts that "may arise between the attorney and the class [and] between the named plaintiffs and the absentees."   *Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir. 1980).[23]  Unfortunately, this type of conflict of interest is glaringly present in this case, with class counsel seeking an attorneys' fee that is grossly excessive under Eleventh Circuit precedent, to the detriment of Class Members.

Compensating counsel for the <u>actual benefits</u> conferred on the class members is the basis for awarding attorney fees.   *Manual for Complex Litigation (Fourth)* § 21.71, p. 336. (emphasis added).   The "fundamental focus is the <u>result actually achieved</u> for class members."   Fed. R. Civ. P. 23(h) advisory committee note (2003) (emphasis added).   As described more fully above in Section IV(A) at pages 3-10, the actual aggregate value of the <u>benefits that will be conferred upon the Class will likely be less than $2.3 million</u>.   The claimed benefits related to *cy pres* and the prospective and injunctive relief are entirely illusory, as described more fully in Sections IV(A)(2) and (3), above at pages 4-10. However, <u>the benefits conferred to class counsel are very real – a cash payment of $5,680,000</u>.

---

[23]  The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopted as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981

Because the requested attorneys' fee of $5.4 million would be <u>significantly more than</u> <u>(and probably more than double) the total benefit likely to be received by the Class</u>, the requested attorneys' fees should be considered unreasonable.   *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 604 (3d Cir. 2010)( court may deny final approval of a settlement where "class members [receive] illusory nonmonetary benefits . . . while granting substantial monetary attorney fee awards.") (*citing* the *Manual for Complex Litigation, Fourth*, § 21.61); *Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 274 (E.D.N.Y. 2009)("As a matter of public policy, it would be unseemly for the rewards to Class Counsel to exceed those to Class Members."); *In re Excess Value Ins. Coverage Litig.*, 598 F. Supp. 2d 380, 390 (S.D.N.Y. 2005)("anomalous and unacceptable for counsel to fare better than the Class.")

1.          **The Requested Attorneys' Fees are Unreasonable Under the Percentage of Recovery Method**

Because the Settlement is a "claims made" settlement rather than a "common fund" settlement, the percentage of recovery method to analyze the reasonableness of attorneys' fees is not required, nor is it the preferred method.   However, the percentage of recovery method demonstrates that the requested attorneys' fee is unreasonable.

In a "common fund" settlement, courts in the Eleventh Circuit assess the reasonableness of attorneys' fees based upon a *reasonable percentage* of the "common fund."   *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991).   A "common fund" settlement is created when the settlement sets aside a <u>specified amount of</u> <u>money</u> to be paid by the defendant for the benefit of the entire class." *State of Fla. v. Dunne*, 915 F.2d 542, 544-45 (9th Cir. 1990); *Eppard v. ViaQuest, Inc.*, 2010 U.S. Dist. LEXIS 122769 (S.D. Ohio Nov. 2, 2010)("class actions that involve a common fund typically include a defined sum of money.")   Although "there is no hard and fast rule . . . the majority

of common fee awards fall between 20% to 30% of the fund." *Camden I*, 946 F.2d at 774-75.[24]   In a "common fund" settlement, Courts may apply the reasonable fee percentage to the entire fund, <u>even when any unclaimed portion of the fund will revert back to the Defendant</u>. *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); *Waters v. International Precious Metals Corp.*, 190 F.3d 1291, 1293 (11th Cir. 1999).   This is consistent with the requirement that attorneys' fees be judged in comparison to actual benefits conferred because an <u>existing benefit</u> was created <u>at the time the fund was established with a "sum certain"</u>, regardless of the possibility that some portion was subject to reversion.   *Id.* at 480 (the right to share in the lawsuit, whether or not they exercise it, "is a benefit in the fund created by the efforts of the class representatives and their counsel.")   *See also Waters*, 190 F.3d at 1297 (a $ 40 million fund "<u>created a benefit on behalf of the entire class</u>" even when subject to partial reversion.)

By contrast, the Settlement in this case is not a "common fund" settlement, because it does not provide the required "defined pool of money" or "sum certain" implicit in the definition of a common fund, but instead requires the Defendants to pay $3.00 per pack to class members on a "claims-made basis" at a future date after all claims are filed and administered. [25]   *Allapattah Servs. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1199 (S.D. Fla. 2006)(identifying a "common fund" as a "contributed a sum certain"); *Strong v. BellSouth Telecomms., Inc.,* 137 F.3d 844, 847 (5th Cir. 1998)(a claims made settlement was not a

---

[24]  Courts often start with a "benchmark" fee, and adjust the percentage according to the various factors first set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) (the "*Johnson* Factors.")

[25]  See *In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 398 (D. Mass. 2008)("the Agreement here creates no fund; it simply provides that [the Defendant] will pay claims on an as-made basis."); *Moore v. Verizon Communs., Inc.*, 2013 U.S. Dist. LEXIS 170027 at *13-18 (N.D. Cal. Nov. 27, 2013); *Brazil*

common fund.) *See also Waters*, 190 F.3d at 1296 ("*Strong* never established a 'common fund' from which money would be drawn.")   A "common fund" is the creature of a court's inherent equitable power <u>over funds under its control</u>, and is established by the Court, not by the parties or their counsel.   *Knight v. United States*, 982 F.2d 1573, 1581 (Fed. Cir. 1993)(emphasis added).[26]

Because it is not a "common fund," the requested attorneys' fees pursuant to the Settlement are not <u>required</u> to be analyzed under the percentage of recovery method.   *See, e.g. Waters*, 190 F.3d at 1294 ("fees awarded from a <u>common fund</u> shall be based upon a reasonable percentage.")(emphasis added).   Indeed, as described below, in a claims made settlement such as the Settlement, a more meaningful and appropriate analysis can be undertaken using the lodestar method instead of the percentage of recovery method.

However, if the Court is inclined to use the percentage of recovery method, the appropriate measure would be to analyze the fees <u>as a percentage of the benefits that are actually provided to the Class</u>.   Plaintiff may argue that the total amount that would be recovered if all class members made claims is appropriate for the same reasons as set forth in *Boeing*, but such an argument would ignore the critical distinction that in a common fund case, <u>the benefit is created for the entire class at the time the common fund is formed</u>, but in a "claims made" settlement, <u>no benefit is created until the claims are actually made</u>.   In *Strong*, 137 F.3d at 847, the defendant agreed to a settlement that required it to issue credits

---

*v. Dell Inc.*, 2012 U.S. Dist. LEXIS 47986 at *2-3 (N.D. Cal. Apr. 4, 2012)(The settlement was not a 'common fund,' but rather. . . payment to Class Members on a claims-made basis.")(emphasis added).

[26]  Under Florida law, the common fund doctrine only arises upon, *inter alia*, "the existence of a fund over which the court has jurisdiction and from which fees can be awarded."   *Fid. & Casualty Co. v. O'Shea*, 397 So. 2d 1196, 1198 (Fla. Dist. Ct. App. 2d Dist. 1981)

on the telephone bills of certain class members that had elected to receive the credit.

Plaintiffs' counsel added up the value of all of the credits that might be taken if each class

member elected to receive them, and referred to this total as the "common fund."    The Fifth

Circuit rejected this characterization, specifically holding that "this case does not involve a

traditional common fund.")(emphasis added).[27]    Indeed, the Supreme Court also recognized

this critical distinction in *Boeing*, and expressly did not extend its ruling to require

comparison of attorneys' fees to "possible recoveries" in a claims made settlement.[28]

      Because compensating counsel for actual benefits conferred is the goal of a class

action fee award, and because no actual benefit is created in a claims made settlement until

the claim is actually made by the class member, courts analyzing the reasonableness of

attorneys' fees in a claims made settlement should base their analysis on the dollar amount of

claims actually paid.    *Strong*, 137 F.3d at 853 (court did not abuse its discretion in

considering the actual results of the settlement.)

      Projecting the actual benefit that will actually be paid to the class in a claims made

settlement will be inexact until all claims have been made, the court is faced with the

prospect of either estimating the level of claims that will be made – a very inexact science –

or deferring its consideration of the motion for attorneys' fees until after all claims have been

made.   *Duhaime v. John Hancock Mutual Life Insurance Company*, 989 F.Supp. 375, 379

(D.Mass.1997)(withholding portion of attorneys' fee pending administration to determine

actual value in a claims made settlement).

---

[27]  *See also In re TJX Companies*, 584 F.Supp.2d at 409 (rejecting such a calculation as "illusory.")

[28]  *Boeing*, 444 U.S. at 481 n.5 ("we need not decide whether a class-action judgment that simply requires the defendant to give security against all potential claims would support recovery of attorney's fees under the common-fund doctrine.")

- 18 -

However, as described above, the estimated value of the Settlement likely to be paid to Class Members is less than $2.3 million.   The proposed attorneys' fee of $5.4 million is approximately 235% of the value returned to the Class – far in excess of the 20% to 30% fee awards allowed under Eleventh Circuit precedent.

**2.    The Lodestar Method is More Appropriate to Analyze the Reasonableness of Attorneys' Fees in a Claims Made Settlement**

Without a defined "common fund" against which the requested attorneys' fees can be measured with precision, a lodestar approach is the preferred method of determining the reasonableness of attorneys' fees.   *Weber v. Gov't Emples. Ins. Co.*, 262 F.R.D. 431 (D.N.J. 2009)(noting that because of the claims-made nature of the settlement, "the exact value of the settlement will be difficult to quantify with precision for the foreseeable future," and deciding to employ the lodestar method); *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 526 n.10 (1st Cir. 1991) ("The absence of any true common fund renders the percentage approach inapposite here."); *In re GM Trucks*, 55 F.3d at 821 ("the lodestar rationale has appeal where as here, the nature of the settlement evades the precise evaluation needed for the percentage of recovery method.")

Indeed, courts with the Eleventh Circuit have often applied the lodestar method rather than the percentage of recovery method in collective or class actions without a common fund where the benefits to actually be received cannot be precisely quantified.   *Holman v. Student Loan Xpress, Inc.*, 778 F. Supp. 2d 1306, 1311-1312 (M.D. Fla. 2011)(citing cases). This Court has previously found the actual amounts disbursed to the class to be "a more appropriate gauge of the value of the attorneys' efforts than the size of the common fund itself" in an FLSA opt-in collective action. *Lepinske v. Mercedes Homes, Inc.*, 2008 U.S. Dist. LEXIS 111166 at *12 (M.D. Fla. July 7, 2008)(Presnell, J).

- 19 -

The Court must review class counsel's lodestar (total hours worked on the case times their hourly rates, and make adjustments to the hourly rates or hours reasonably expended, if necessary.   Because class counsel will not submit their lodestar and other information necessary to analyze reasonableness under the lodestar method, the Objector requests leave to respond to these motions after they are filed.

### 3.    The "Separate Negotiation" of the Fee With the Defendants Does Not Change the Required Analysis

Plaintiff's Motion for Preliminary Approval attempts to head-off Court scrutiny of the requested fee by implying that any potential conflicts of interest in arriving at the fee were eliminated because the fees will be paid by the Defendants (rather than from a common fund) and were negotiated separately *after* finalizing the other Settlement terms.   Docket No. 114 at 12 ("The agreement with respect to attorneys' fees, costs and expenses was negotiated after the substantive terms of the settlement, including the prospective remedial/injunctive relief to the Settlement Class, had been negotiated and agreed upon during the mediation.")

Courts around the country have determined that this type of "separate negotiation" does <u>not</u> minimize potential conflicts and, in fact, may serve to <u>heighten the conflicts</u> of interest between the class and proposed class counsel in arriving at an appropriate fee award. In *Weinberger*, 925 F.2d 518 at 524, the First Circuit addressed this exact issue, holding that when fees are paid from a defendant's own funds rather than from a common fund, the court must be particularly vigilant in assessing the reasonableness of the attorneys' fee because a conflict results from "the danger that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees.")   Likewise, in *In re GMC Truck.*, 55 F.3d at 819-20, the Third Circuit held that, in the case of a separate fee agreement providing for fees payable directly from the defendant rather than a common fund,

"the fee agreement clearly does impact [class members'] interests, as it is, for practical purposes, a constructive common fund.")   *See also Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 845 (E.D. La. 2007)(Given the "economic reality that a settling defendant is concerned only with its total liability," it is easy to see how a negotiated fee award, even if it is to be paid separately by the defendant, does not eliminate the potential for collusion.")(*citing Strong*, 137 F.3d at 848-49).

For these reasons, the fact that the Defendant and proposed class counsel negotiated and agreed upon attorneys' fees for proposed class counsel does not limit the Court's obligation to carefully review attorneys' fees.   *Waters*, 190 F.3d 1291 at 1296 n.9.   ("[T]he district court has an independent supervisory duty to assess the appropriateness of the fee award apart from any agreement reached by plaintiff and defense counsel.")(emphasis added).[29]

### D.  The Excess Should be Re-allocated to Class Members

The excess portion of the requested fee that is not awarded to counsel should be re-allocated and distributed to class members by rejecting the current Settlement and having the Defendants agree to modification of the terms of the Settlement Agreement.[30]   The Defendants would likely have no objection to re-allocating the money earmarked by proposed counsel to pay these excessive fees to instead increase the amounts available to Class Members because "a defendant is interested only in disposing of the total claim

---

[29]  *See also Fresco v. Auto. Directions, Inc.*, 2009 U.S. Dist. LEXIS 125233 (S.D. Fla. Jan. 16, 2009)(declining to award the full $25 million in attorneys' fees that were separately negotiated with defendants after the substantive terms of the settlement were set.)

[30]  "The total fund could be used to measure whether the portion allocated to the class and to attorney fees is reasonable. Although the court may not rewrite the parties' agreement, it can find the proposed funds for the class inadequate and the proposed attorney fees excessive, and can allow the parties to renegotiate their agreement."   *Manual for Complex Litigation (Fourth)*, § 21.7, p. 335.

asserted against it; . . . the allocation between the class payment and the attorneys' fees is of little or no interest to the defense." *In re GMC Truck*, 55 F.3d 768 at819-20; *Strong,* 137 F.3d at 849-50 (recognizing the "economic reality that a settling defendant is concerned only with its total liability" and that "the allocation between the class payment and the attorneys' fees is of little or no interest to the defense."); *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 744 (7th Cir. Ill. 2008) ("defendants in class actions are interested in minimizing the sum of the damages they pay the class and the fees they pay the class counsel.")

### E.  The Notice Sent to Class Members Was Defective

Pursuant to Fed.R.Civ.P. 23(c)(2) and 23(e), the notice sent to class members must "clearly and concisely state, in plain, easily understood language" numerous items including the nature of the action, the claims and defenses of the parties and the terms of the settlement. Notice should be designed to give class members all of the information that they need "to decide, intelligently, whether to stay in or opt out." *Amchem*, 521 U.S. at 628.   The Notice sent to class members in this action was defective because (as described above) it: 1) failed to accurately describe the value of the settlement to class members; 2) failed to accurately describe the value of *cy pres* payments; 3) falsely claimed significant benefits related to prospective remedial or injunctive relief; and 4) failed to accurately disclose sufficient information to assess the reasonableness of the requested attorneys' fees.   Without a more clear and accurate description of the Settlement in the Notice, class members cannot make an "intelligent" decision whether to object, opt-out or remain in the proposed class.   *Amchem*, 521 U.S.at 628.

## VII.    CONCLUSION

For the reasons detailed above, the Court should deny Plaintiff's motion for final approval of the Settlement.    Alternatively, the Court should allow the Objector leave to file an opposition to Plaintiff's motions for final approval and/or for attorneys' fees.

Respectfully submitted,

*/s/ Jeremiah J. Talbott*
JEREMIAH J. TALBOTT, ESQ.
Fla. Bar No. 015484
Law Office of Jeremiah J. Talbott, P.A.
900 East Moreno Street
Pensacola, FL   32503
(850) 437-9600 / (850) 437-0906 (fax)
jjtalbott@talbottlawfirm.com;
civilfilings@talbottlawfirm.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of February, 2014, I electronically filed the foregoing with the Clerk of Court utilizing the CM/ECF system, which will send same to all parties.

Respectfully submitted,

 /s/ Jeremiah J. Talbott
JEREMIAH J. TALBOTT, ESQ.

- 23 -