UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


Docket No. 6:12-CV-803




. . . . . . . . . . . . . . .
JOSHUA D. POERTNER          :
                           :        Orlando, Florida
          Plaintiff        :        May 22, 2014
                           :        12:59 p.m.
               v.          :
                           :
THE GILLETTE COMPANY, ET AL.:
                           :
          Defendants       :
. . . . . . . . . . . . . . .







TRANSCRIPT OF FINAL FAIRNESS HEARING
BEFORE THE HONORABLE GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE






Court Reporter:    Amie R. First, RPR, CRR
                   AmieFirst.CourtReporter@gmail.com


Proceedings recorded by mechanical stenography.

Transcript produced by Computer-Aided Transcription.

```
 1    APPEARANCES:

 2

 3    For the Plaintiff:  E. Clayton Lowe, Jr.

 4                        Dennis G. Pantazis, Sr.

 5                        Joshua R. Gale

 6                        Robert C. Schubert

 7                        Noah Schubert

 8

 9

10    For the Defendant:  Craig Stewart

11                        Darren K. Cottriel

12                        Katie Tinsley

13

14

15    For the Objector Theodore Frank:

16                        Adam E. Schulman

17                        Benjamin C. Haynes

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2          THE COURT:  Good afternoon.
 3          THE DEPUTY CLERK:  This is in the matter of
 4  Joshua D. Poertner versus the Gillette Company and
 5  Procter & Gamble Company, Case Number
 6  6:12-Civil-803-Orlando-31DAB.
 7          THE COURT:  All right.  And appearing for the
 8  plaintiff in the class?
 9          MR. LOWE:  Clay Lowe.
10          THE COURT:  Okay.  Any others?
11          MR. PANTAZIS:  Did you say appearing?  Dennis
12  Pantazis of the firm Wiggins, Childs, Quinn & Pantazis.
13          THE COURT:  Okay.  Thank you, sir.
14          MR. GALE:  Joshua Gale.
15          THE COURT:  Mr. Gale.
16          MR. ROBERT SCHUBERT:  Robert Schubert, Schubert,
17  Jonckheer & Kolbe.  With me is Noah Schubert.
18          THE COURT:  Okay.  I guess you all are related?
19          MR. ROBERT SCHUBERT:  We indeed are, Your Honor.
20          THE COURT:  Brothers.
21          MR. ROBERT SCHUBERT:  Thank you, Your Honor.
22          THE COURT:  All right.  And for the defendants?
23          MR. STEWART:  Good afternoon, Your Honor.  Craig
24  Stewart.  And with me is my partner, Darren Cottriel.
25  We're both from Jones Day.  Also with me is Katie Tinsley
```

1    who is from Carlton Fields.

2            THE COURT:  Okay.  And in the back?

3            MR. SCHULMAN:  Adam Schulman for the objector,

4    Theodore Frank.  With me is Benjamin Haynes.

5            THE COURT:  Okay.  All right.  Well, I set this

6    aside for a fairness hearing in this case with respect to

7    the proposed settlement.

8            And I -- we amended the procedure a little bit to

9    provide or to accommodate some of the objections concerning

10   the timing.  And hopefully I think that's been resolved.

11           So you guys back there are representing Mr. Frank

12   as an objector?

13           MR. SCHULMAN:  Yes, Your Honor.

14           THE COURT:  There is nobody else here representing

15   an objector, correct?

16           Having seen none, having heard none.

17           Okay.  Let me say this.  I set aside an hour and a

18   half for this, but I can't imagine there's much you can say

19   that is not included in this stack of papers I have here,

20   all of which I've read.

21           I haven't read the case law in detail, but I've

22   read some of it.  And I'm generally familiar with the

23   issues.

24           So I'd be happy to hear from the parties and, of

25   course, from the objectors.  And then we'll go from there.

 1   But I do have to leave here no later than 2:30, and

 2   preferably 2:20, to pick my son up from the airport.

 3            So do you all have any preference?  Do you want to

 4   make a brief presentation by the parties as to this, or do

 5   you want the objectors to go first?  Have you all talked

 6   about it or do you care?

 7            MR. LOWE:  I would like to go first since no one

 8   else is.

 9            THE COURT:  Okay.  Go ahead.  Give it a shot.

10            MR. LOWE:  Yes, sir.  As I said earlier, I'm Clay

11   Lowe.  I'm one of the attorneys representing the plaintiff

12   in the settlement class here.

13            As the Court noted, I really don't want to belabor

14   the point since we've briefed this in detail.  All the

15   facts in the law are laid out, I believe, sufficiently in

16   our briefs and particularly in response to the objectors.

17            But I do want to reiterate that we reached this

18   settlement after being directed by the Court to select a

19   mediator from its list of qualified mediators and to

20   mediate in good faith in hopes of reaching a settlement.

21            That's what we did.  We mediated in good faith and

22   at arm's length and with a mediator, Rod Max, who is known

23   throughout the country as very experienced in handling

24   mediations of this type, consumer class actions.  And with

25   his help, we negotiated this settlement.

1          During the whole course of it, each of us, the

2     lawyers on both sides, as well as Mr. Max, were operating

3     under the precedent of this circuit in reaching what we

4     believe we agreed upon for the class and the resulting fee.

5          We also used the damage analysis that we had

6     submitted with our request for class certification, which

7     was calculated based on discovery we took from the

8     defendant, the expert that we hired, a statistician, and an

9     economist who also made his own independent analysis of the

10    damages in this case.

11         And that damage, as you may recall, is the premium

12    difference between CopperTop batteries and the Ultra

13    batteries that were being sold.

14         So we kept that in mind in negotiating a relief

15    for the class, which we came up with in the settlement, the

16    $3 to $6 range and then the maximum of $12.

17         In this case, in our opinion, had it passed

18    through all the hurdles of being certified as a class

19    action, going through the inevitable interlocutory appeals

20    and then back down in trying this case, we believe that the

21    class would not have recovered this much had it been tried.

22         If it had been tried, we would have used the same

23    damage analysis.  And assuming the jury overlooked their

24    defenses -- which, in hindsight, were quite strong and we

25    would have had to overcome.  Assuming we were 100 percent

 1   right, the class would have been in the same situation.

 2          However, at the end of a trial and a judgment, I

 3   would expect the fees and expenses to be taken from the

 4   judgment would be substantially higher than we're asking

 5   for now.

 6          And it would reduce the recovery to the class.

 7   That is, each person would not get $6.  They would get

 8   $6 less perhaps a third, less expenses, less administrative

 9   costs.  That's not part of this settlement.

10          In our opinion, each class member is entitled to a

11   mathematical certainty, an undisputed amount, if they make

12   a claim in this case, which equates to 100 percent or close

13   to it of what they could have recovered.

14          Now --

15          THE COURT:  How did you arrive at this $7 million

16   customer figure?

17          MR. LOWE:  That was derived from the data that the

18   defendants cumulate on a weekly and monthly basis in part

19   from KCC -- or not from KCC.  Nielsen.

20          They have an in-house group of -- I can't remember

21   the exact name for them.  But the Nielsen company obtains

22   scanning data every day from every store in the country

23   about batteries being sold.  However it does it, it doesn't

24   include personally identifiable information.  It just tells

25   how many are being sold and at what price.

1          And before they jump on that and say, ah-ha, you

2     have the names of class members, and we don't.

3          THE COURT:  I take it there wasn't much

4     disagreement as to the validity of that number?

5          MR. LOWE:  No.  But, frankly, I think it was a

6     little low.  I believe there were more over this four-year

7     time period.  I would have thought it would have been

8     higher.

9          That and also KCC, the administrator we hired in

10    this case, also did their own analysis.  It's included in

11    their report.  But their estimate was the 7.6.

12         So with my understanding -- and mine's derived

13    from just looking at the data that I got during discovery

14    from the defendants regarding sales and in particular

15    states.

16         But keep in mind, this case started here as a

17    Florida-only class.  A lot of our discovery initially

18    was just Florida.  So when I would extrapolate it over

19    50 states, I thought it should have been higher.  But --

20         THE COURT:  We use a lot of batteries down here.

21         MR. LOWE:  There's no way -- you're the third

22    highest state behind New York and California.  So that's

23    how we came up with that.

24         And I don't want to really belabor the point on

25    this, but the Bennett-bearing factors indicate overall

1   fairness of the settlement.  The likelihood of success at

2   trial, which I just talked about, of course, there was no

3   certainty.  But even if there were certainty, we probably

4   couldn't have done any better even if we tried it.

5        And, you know, something I overlooked and I want

6   to mention, California -- I should mention that this

7   settles two cases that proceeded independently.

8        The Court will recall early on, one of the first

9   things filed in this case here, in this case, was a motion

10  to transfer this case to California or either stay it or

11  dismiss it in favor of the California case.  And Your Honor

12  overruled that motion.  And after that, they proceeded as

13  two separate cases, as they were filed.

14       We didn't work in conjunction with the guys in

15  California.  They filed their own discovery.  We filed our

16  own discovery, took our own depositions, used our own

17  experts.

18       THE COURT:  My impression was -- I may be wrong --

19  that our case proceeded at a faster pace than theirs.

20       MR. LOWE:  Yes, it did.  I think your scheduling

21  order dictated that, frankly.  So we did proceed a little

22  faster.  And I think that's why we got to the mediation

23  faster than they did.

24       Now, they did fully brief class certification out

25  there, but they didn't have a hearing on it before we

```
 1   reached a settlement agreement.

 2          THE COURT:  Let me tell you -- and I don't want to

 3   interrupt you.

 4          MR. LOWE:  Please do.  I'm just reiterating what

 5   we've already said in our briefs.

 6          THE COURT:  But I learned early on as a lawyer, I

 7   was much more interested in what the judge was thinking

 8   than what I was saying.

 9          And, you know, I've reviewed all of this.  And I

10   think Mr. Frank's main objection and my main concern here,

11   it is the relationship between attorneys' fees and the

12   amount of actual payment to class members.

13          Now, I understand the legal issue is whether you

14   base the reasonableness of this fee on a common fund

15   concept or not.  And, you know, I've read Waters and some

16   of these cases, but I'm still troubled by that.

17          So I would spend whatever time you could on that

18   issue, because that's -- that's where I'm having a problem.

19          MR. LOWE:  That's right.  That is the lightning

20   rod for this case that brought in the objectors.

21          As I said, we relied on Waters, Boeing versus Van

22   Gemert, or however you pronounce that, and the progeny of

23   that.  The Boeing case is a U.S. Supreme Court case that's

24   been followed by Camden and Waters in this circuit.

25          THE COURT:  Right.
```

1              MR. LOWE:  That says you look to the potential

2      economic value of the settlement in calculating the fund.

3      And then you apply a reasonable percentage under the

4      circumstances to that fund in reaching a fee.

5              That's what we did here.  And we negotiated a

6      number that, in fact, was lower than the number proposed by

7      the mediator.

8              THE COURT:  I agree that if you accept as gospel

9      the fact that the law in this circuit is that you look at

10     the $40 million number and apply a percentage of that, your

11     fee is reasonable, if that's the law.

12             I'm not sure I read Waters quite as definitively

13     as you do.  There are some significant differences between

14     Waters and this case.  In Waters, presumably you knew who

15     the class members were, and you could communicate with

16     them; and they numbered in the hundreds, not in the

17     millions.  The ratio of the fees to recovery there was two

18     to one, not fifteen to one.

19             The common fund there had a direct benefit to the

20     class members because the higher that number, the higher

21     your claims were, as I understand the way that settlement

22     was structured.

23             And I think the Eleventh Circuit made clear, you

24     know, every case is different.  And it's an abuse of

25     discretion standard.  And some cases may require a

1  different perspective.

2          MR. LOWE:  That is correct.  But the overriding

3  number of cases in this circuit that have interpreted that

4  in these kind of cases where we have consumers suing under

5  consumers statutes who are trying to deter conduct by

6  such people and gaining injunctive relief in addition, a

7  10.9 percent fee is not unreasonable, regardless of the

8  claims rate.

9          There is no case that I'm aware of in this circuit

10  that mandates the use of redemption rates in a case such as

11  this.  This obviously isn't a novel case in this circuit.

12  These are seen often.

13          THE COURT:  But you're switching the standard on

14  me.  You're saying a case that mandates the use of

15  recovery.  I'm not suggesting I'm required to do that.  I'm

16  suggesting I can consider that as part of my analysis.

17          MR. LOWE:  You certainly do have discretion to

18  consider whatever you think is necessary.  I mean, I don't

19  disagree with that.

20          But I'm saying that the precedent in this circuit

21  is you look to the potential economic value.  And as I said

22  before, I think it's even a little undervalued.  But in any

23  event --

24          THE COURT:  Okay.

25          MR. LOWE:  -- whether we were asking for a

1   10 percent fee or a 5 percent fee or a third, I think it's

2   still all in line with the precedent of this circuit.

3            And, I mean, if you're requesting to use full

4   discretion, although this isn't a lodestar jurisdiction, if

5   you used a lodestar cross-check, then the hours that we

6   have in two cases, the amount of expenses that we incurred

7   just in having people test hundreds of batteries was

8   200-something thousand dollars.

9            People don't take that kind of gamble if they

10  think their fee is going to be based on some redemption

11  rate and not on the law in this circuit, as we understand

12  it is.

13           So that would completely deter people from

14  enforcing these kind of statutes.

15           THE COURT:  Well, I understand that.  But some

16  would request the socioeconomic benefit of spending

17  $5 million to recover $300,000.

18           MR. LOWE:  That's not exactly all that's

19  recovered.  It has deterred this conduct.  It's stopped

20  the conduct.  And I assure you that the people at

21  Procter & Gamble who were involved in this, the next time

22  they are asked to make some representations regarding a

23  product, they are going to think twice.

24           And the products they have on the market now, the

25  batteries, don't make this kind of claim.  And battery

1    purchasers are continuing to purchase.  They wear out, so

2    you purchase them.

3           THE COURT:  I put considerable weight on the --

4    although the objectors disagree with this, I do weigh

5    pretty heavily the injunctive aspect of this based on this

6    representation that it was this lawsuit that caused them to

7    take this advertising or this product off the market.

8    Clearly there's a benefit there.

9           Is there any estimate or can P & G tell me what

10   the cost of the cy pres contribution is to them?

11         MR. LOWE:  They would have to answer that.  You

12   know, it's valued in the settlement as the retail value.

13         THE COURT:  I know.

14         MR. LOWE:  I will take issue with calling it cy

15   pres.  We never intended that to be a cy pres.  And out of

16   full disclosure, during settlement that was just something

17   they offered and we said okay.

18         Because we, in our opinion, we got full recovery

19   for the class.  Now, whether people will decide they want

20   $5 back or $6 back and are willing to go online and do it,

21   that's up to them.  But it doesn't diminish the amount of

22   money that was made available to the class nor should it

23   diminish the amount of money that the lawyers can seek in

24   this type of case.

25         I'm not at the whim of the consumer who says I'm

```
 1    not interested in going online and filing a claim.  I

 2    recovered that in this case after being directed to mediate

 3    it.  And we did so in good faith, and we reached a good

 4    settlement here.

 5         And all we're doing is asking for a fee that's in

 6    line with the other precedent in the circuit.  And, I mean,

 7    that's where we are.

 8         THE COURT:  Okay.  I understand your position.  I

 9    see no reason to believe that your negotiations in

10    mediation were not in good faith.  I mean, I accept that.

11    I see no reason to question that.

12         And I'll look at these other things.  And I think

13    I understand your position quite well.  Y'all have done a

14    good job of advocating it.

15         MR. LOWE:  Well, in conclusion, then, I would

16    request that you grant our motion for final approval and

17    award the requested fee and the incentive award.

18         And I would like to reserve some time to respond

19    to the objectors, if I may.

20         THE COURT:  Sure.  Does anybody else on this side

21    of the table want to -- California want its say?

22         MR. ROBERT SCHUBERT:  Yes, Your Honor.  Thank you,

23    Your Honor.  Robert Schubert for the California case.

24         I think Your Honor has put his finger on the key

25    issue in the case.  And that is the reasonableness of the
```

1   attorneys' fees award.  So I won't enlighten the Court

2   about the progress of the cases.  I think the Court is well

3   aware from the declarations.

4         But I think there's an important factor that I'd

5   like to underline.  As the Court is aware, first under

6   Mr. Max's supervision, we negotiated discovery for the

7   class.  And I think there's strong evidence, which we

8   sincerely believe, the recovery approximates the best we

9   could have done at trial.

10        Once that was negotiated, we then turned to the

11  issue of fees under Mr. Max's supervision.  That

12  negotiation, as Your Honor might expect, was contentious.

13  The attorneys want more.  Duracell and Procter & Gamble

14  want to pay less.

15        At that point in time, Procter & Gamble and

16  Duracell had every interest in keeping the fee as low as

17  possible.  That's a cashout.  This affects their bottom

18  line.

19        Plaintiffs want to be fully compensated, would

20  like to get a reasonable multiplier on their time, would

21  like to get rewarded for what they think they've

22  accomplished.

23        This was an arm's length negotiation.  It was, in

24  effect, a business deal, although that business deal is

25  clearly subject to court approval.

```
 1            And I think that the negotiation between very

 2    experienced attorneys on the Procter & Gamble side and

 3    plaintiff's counsel is a very strong indication that fee

 4    was reasonable.

 5            There was no reason for Procter & Gamble to give

 6    money away.  And there's no evidence that that fee

 7    negotiation had any relationship to the negotiations on the

 8    settlement.  In other words, what I'm trying to say, that

 9    settlement was a separate negotiation.

10            And I think that's a strong indication that weighs

11    in favor of Your Honor, in the Court's discretion,

12    approving that fee.

13            THE COURT:  I think you're right.  I think I agree

14    with you on that.  And it's probably something I should

15    have mentioned in my earlier comments that I -- I found

16    that to be a positive thing with regard to the merits of

17    this settlement.

18            And I kind of analogize it, we've had a flood of

19    these FLSA cases over the last couple of years.  I was the

20    judge that said, listen, as long as the -- as long as the

21    settlement that we have to approve appears reasonable and

22    the lawyers on each side are competent and there's no

23    collusion, and as long as the settlement is reached, you

24    know, before the attorneys' fees, as officers of the Court,

25    I'm not in a position to question that.
```

```
 1               So what I did is I started a standard procedure

 2    that if you want to settle one of those cases with me,

 3    you've got to resolve the merits first and then the

 4    attorneys' fees.  And it's the same concept, I think, that

 5    you're impressing on me now.

 6               So I do appreciate that.  And I understand that.

 7               MR. ROBERT SCHUBERT:  Thank you, Your Honor.  I

 8    know other folks want to speak so I'll sit down.

 9               THE COURT:  Thank you.

10               All right.  P & G.  You know, I own a few shares

11    of your stock.  I think I disclosed that, didn't I?

12               MR. STEWART:  I don't recall.

13               THE COURT:  I think I did.

14               MR. STEWART:  Very well may have.

15               Yes.  Thank you.

16               THE COURT:  Not enough for me to retire anyway.

17               MR. STEWART:  I won't repeat what's been said

18    other than to state that our agreement obviously with the

19    points that have been made in particular that this was a

20    very hard fought, you know, extensive negotiation that went

21    on for months, completely absolutely at arm's length, very

22    adversarial.

23               And I also put an exclamation point, I guess, on

24    the point about the risks that plaintiffs faced if this

25    case had gone forward.
```

1          And in all of this briefing, that point seems to

2    get lost when we're talking about the value here to the

3    class and all of these issues.

4          Our position is that this was a very weak case to

5    which we had very strong defenses.  Even if this Court had

6    certified a class -- and we contend the class certification

7    was not proper -- they would have faced significant issues

8    at trial.

9          Our proof was that half the class members never

10   even saw these advertisements.  That would have been a

11   defense at trial, even if it had not been a defense as

12   class cert.

13         We had contemporaneous testing showing that the

14   batteries, indeed, lasted longer.  And we contested the

15   amount of damages because there was more than just -- there

16   was power check, which was an additional value that had to

17   be taken into account.

18         I know Your Honor is very well aware of that.  I

19   just think it's worth emphasizing given that it seems to

20   get lost in a lot of the briefing here.

21         The only other point I would add, Your Honor, is

22   just to respond to the question about the donated

23   batteries.  I certainly agree with plaintiff's counsel that

24   that really was not intended as a cy pres recovery.  And

25   that is it doesn't bear really on the adequacy of the

```
 1   compensation of the class for all the reasons that Mr. Lowe
 2   outlined.
 3          The class compensation, the class we believe here,
 4   was adequate standing alone.  And when we add the
 5   injunctive relief Your Honor mentioned, as well as the
 6   batteries, we think, do add value, it was a binding
 7   commitment that Procter & Gamble would make these
 8   donations.
 9          You asked about the cost to Procter & Gamble of
10   those batteries.  I don't have that figure with me.  It's
11   obviously less than the retail value.  The cost to
12   Procter & Gamble to manufacture and distribute those
13   batteries would certainly be less than what they would be
14   charging at retail.
15          THE COURT:  Okay.
16          MR. STEWART:  Thank you, Your Honor.
17          THE COURT:  All right.  And the lawyers for
18   Mr. Frank?
19          MR. SCHULMAN:  Thank you, Your Honor.  Good
20   afternoon.
21          Preliminarily, I'd like to thank the Court for
22   permitting response and reply papers to be filed with
23   respect to the objections because it's enabled a thorough
24   briefing of all of the relevant issues that we don't see in
25   every case.
```

1        And I'd like to pick up on a few of those issues.

2   But if the Court has any pressing questions for me, I'd be

3   glad to begin there.

4        THE COURT:  No.  I've read your papers.  They are

5   well done.  And I was happy to give you the opportunity to

6   try to educate me on this.  So go ahead.

7        MR. SCHULMAN:  Okay.  Well, I think it's useful

8   now to perhaps clarify a few of the arguments that

9   Mr. Frank is not making but that the parties want to

10  attribute to him.

11        The first of those is that Mr. Frank is not

12  arguing that the sum total of the constructive common fund

13  is inadequate.

14        It's fine that the settling parties are settling

15  for roughly $6 million or a little bit more than that,

16  whatever the value of that you can attribute to cy pres

17  donation would be, and not the $50 million that they assert

18  that the settlement is worth.

19        But as the Dry Max Pampers court noted, the court

20  can usually trust an adversarial negotiation to get the

21  aggregate dollar value right.

22        Rather, Frank is arguing that the allocation of

23  the proceeds is unfair, because counsel wind up with

24  90 percent of the monetary total, over 90 percent;

25  undetermined third party wind up with batteries worth

 1   millions of dollars in retail value; and less than

 2   1 percent of the class will share the remaining 5 percent

 3   of the monetary proceeds, while the other 99 percent of the

 4   class winds up with nothing.

 5           THE COURT:  How would Mr. Frank go about doing

 6   this any better?

 7           MR. SCHULMAN:  Well, if you look in the reply

 8   brief, I suggested a number of avenues that the settling

 9   parties could have taken.

10           We've seen settlements very similar to this that

11   were either voluntarily revised or eventually rejected and

12   then the parties went back to the table and actually

13   provided direct payment to consumers.  And they do that by

14   getting the information from retailers.

15           The Bayer Combination Aspirin was a prime example

16   of this.  I think it's at pages, you know, 14 to 17 of the

17   reply brief.  It might be 12 or 13 as well.

18           THE COURT:  I'll go back and reread it.

19           MR. SCHULMAN:  Yeah, it's in there.

20           There are definite alternatives.  And I'm

21   confident to say that if this settlement is rejected, one

22   of those alternatives would be reached and the class would

23   be getting a lot more than $344,000 that they are getting

24   currently.

25           The second argument Mr. Frank is not making is

```
 1    that there has been any explicit collusion between the
 2    settling parties to sellout absent class members.
 3          But he need not make this argument because, again,
 4    as the Pampers court stated, an adversarial process or what
 5    the parties referred to -- he referred to as their
 6    hard-fought negotiations extends only to the amount the
 7    defendant will pay, not the manner in which that amount is
 8    allocated between the class representatives, class counsel,
 9    and the unnamed class members.
10          And the temporal -- the separation of negotiation
11    of the class recovery followed by the negotiation of the
12    class counsel fee doesn't resolve that problem.  Community
13    Bank out of the Third Circuit, I think it was a decision by
14    Judge Ambro, was exactly on point.  It rejected that idea.
15          The only way you can actually divorce meaningfully
16    is to have the class agreement approved and then negotiate
17    on the fees.  Because, otherwise, the plaintiffs know that
18    the defendants have a reserve price, an all end number that
19    they are not willing to exceed.
20          So if you negotiate the class settlement
21    separately, they still have the incentive to maximize that
22    because they know that they're going to have to show that
23    to the Court later when they're, you know, asking for fees.
24          Do you see what I'm saying?
25          THE COURT:  Yeah.  I'm not sure I agree with it,
```

1    but I see.

2         MR. SCHULMAN:  Well, it comes from the Third

3    Circuit Task Force from 1985 which is well respected and

4    cited.  It might even be cited in this circuit.  I'm not

5    sure whether Waters cited it, but I think Strong cited it

6    which was then cited by Waters.

7         So the economic reality, which is an approach

8    adopted by the Eleventh Circuit in the Piambino case is

9    that the defendant is indifferent with respect to who

10   actually benefits from the settlement funds, whether it's

11   the class or class counsel.  And because of this, the Court

12   must seek out, quote/unquote, subtle signs in the

13   provisions of a settlement that indicate unfairness.

14        Those signs are here in spades.  It's predictably

15   a disproportionate fee award, disproportionate incentive

16   awards, and a segregation of the fee from the class relief

17   such that if you reduce the fee it goes back to the

18   defendant.

19        The third thing Mr. Frank is not arguing is that

20   the claims rate is per se too low to be approved.  Rather,

21   the problem is that the claims rate in conjunction with the

22   Draconian payment caps and the proof of purchase

23   requirements resulted in a settlement that would inevitably

24   entitle class counsel to an excessive portion of the

25   constructive common fund.

```
 1            As acknowledged by Miss McComb, the settlement
 2   claims administrator, it was a foregone conclusion that
 3   only a miniscule amount of claimants would come forward and
 4   that the negotiated settlement would result in a
 5   disproportionate fee.
 6            Publication notice isn't the only factor that
 7   depresses claims rates.  Recall that the settling parties
 8   assert that the notice reached 70 percent of class members,
 9   which they estimated at 7.2 million.  So 70 percent would
10   be supposedly more than 5 million class members saw the
11   notice.  Yet only 55,000 of them bothered to submit a claim
12   form.
13            One readily apparent reason why those 4.95 million
14   didn't -- who saw the notice but didn't submit a claim form
15   is that because of the dollar -- is because of the dollar
16   cap and the unit caps, the proof of purchase restrictions,
17   it made it simply not worth their time.
18            A recent survey by another well-known claims
19   administration company showed that in consumer settlements,
20   the claims filing rate correlates with the amount
21   available.
22            Thus, they found that rates of 0 to 3 percent,
23   which is what we see here, .76 percent, when only $5 is
24   available but that the rates doubled when $15 is available
25   and continued to increase as the potential reward
```

1   increases.  And that, you know, accords with common sense.

2        And one last argument that Mr. Frank is not making

3   is that the benefit fairness factors are irrelevant and

4   should be ignored.

5        They do matter.  But as the Eleventh Circuit and

6   others have demonstrated, they are not an exhaustive

7   catalog of reasons to reject a settlement.  The most common

8   defective settlements are ones of allocation amongst class

9   counsel, class representatives, and absent class members.

10        Because of the defendants' indifference to the

11   allocation, the only supervision can be achieved by the

12   participation of objectors to the Court itself.

13        And I ask the Court to consider seriously the

14   reality of the settlement.  The parties continue to ask the

15   Court to view the settlement as providing a total benefit

16   of more than $43 million to class members plus the 5.6 to

17   class counsel.

18        Because of the Court's prudent decision to

19   delay the fairness hearing, we now know that more than

20   $42 million of that supposedly $43 million benefit will

21   never even be leaving the bank account of the defendant.

22   Contrary to what the settlement parties assert, that

23   matters.

24        Unless class counsel are properly incentivized to

25   care about the actual amounts claimed, in the future we're

1    going to continue to see these severe claim caps, proof of

2    purchase requirements.

3              For example, consider a hypothetical settlement

4    where class members are eligible to claim $100 but only if

5    they make claims in $5 increments twice a year for the next

6    ten years.

7              Is that really worth the same as a settlement

8    which directly transmits $100 to the class members' bank

9    accounts?

10             At the end of the day, we are left with a

11   settlement that is overly generous to class counsel and

12   nonparty charities.  And I'm confident that if the Court

13   rejects the settlement, the parties will do better as they

14   did in baby products, as they did in Bayer Combination

15   Aspirin, and as they did in Pecover v. Electronic Arts, all

16   of which are cited in our papers.

17             Thank you.

18             THE COURT:  Thank you, sir.  I appreciate your

19   help.

20             All right.  Rebuttal?

21             MR. LOWE:  I still didn't hear how they would

22   propose to make this better.

23             THE COURT:  I was going to come back and talk to

24   you.

25             MR. LOWE:  I guess that's what they hope.  But if

1    you left it up to me, if we tried it, I think we would get

2    more money.  But then I can't take that uncertainty when

3    offered with an opportunity to get 100 percent recovery for

4    the class.  Why would I want to try it?

5              Like I said before, if we tried it, we'd get a

6    pile of money or a fund of money of -- let's say it was

7    $50 million that a jury awarded.  What do we do with it?

8              Do you think the claims rate is going to be any

9    higher?  No.  But we're going to be asking for a higher

10   fee.  We will have used this Court's time for another year

11   or so, the Eleventh Circuit Court's time at least once on

12   an appeal or interlocutory appeal on the motion.  And then

13   we would inevitably have an appeal of the judgment.

14             There's not a better result.  When you weigh all

15   of the economies of all of this, there's not a better

16   result.  And that's why you'll never come up with one.

17             Now, they keep talking about the Pampers

18   settlement as like something we should all look at.  In

19   Pampers, at least from my reading of it, that settlement

20   was the defendants agreed to put some labeling on Pampers

21   saying look out for diaper rash.

22             And then they were going to pay for residency

23   somewhere for a diaper rash diaper and they were going to,

24   for a short period of time, reinstate their refund program

25   for people that weren't satisfied with their diapers.

 1          It didn't provide any fund to the class.  And it

 2    was rejected, as it should have been.  That's nothing

 3    similar to this case.

 4          We litigated this thing as hard as we could.  We

 5    got to the class cert stage.  The Court directed us to

 6    settle it or try to in good faith.  And we did.  And we did

 7    it in a manner that complies with the law in this circuit.

 8          We came up with a method where every class member

 9    that wants 100 percent of their money back could easily go

10    online, make a claim, and get their money back.  Whether

11    those people wanted it, I can't control that.

12          Now, he talks about the Pecover case.  I pulled

13    out some of the documents from that.  He was talking about

14    they went back and changed the notice in that one.

15          But from the order -- it's docket number 449

16    entered on 4/2/13 in that case -- it states, and I quote,

17    the Court declines to require class counsel to reach out to

18    video game retailers or conduct other search efforts to

19    locate physical addresses of class members proposed by

20    Mr. Frank.

21          That was rejected and it should be rejected here,

22    that proposal, because we cannot identify individual class

23    members here.  We've looked at their data, their sales

24    data.  They don't have it.

25          Now, if we spent millions of dollars canvassing

the country, asking people, you know, if they have an

address for someone who purchased an Ultra battery during

the class period, well, you know, maybe we'll find a few.

But, again, the economic benefit of that just isn't there.

So I can't hear anything from him to say he would

make it better.  He just has a philosophical -- Mr. Frank

has a philosophical difference of approval of consumer

class actions.

And it looks like from my reading of the cases

he's been involved in and the other editorials he's made

throughout the country he's just bent on doing away with

consumers class actions.

If that's what he wants to do, I mean, that's his

right; but take it up with the legislature.  Because the

law in this circuit, I believe, and I strongly advocate to

you, allows what we've done and condones what we're trying

to do here.

And that's settle this case on a fair basis and

get a reasonable fee out of it for our efforts that are

supported by the lodestar of over $3.5 million and $272,000

worth of expenses.  They were all incurred before we ever

got to the mediation part.

Now, you know, we can continue this case, keep

litigating it.  If it's not approved, our lodestar will get

up in short order, I'm sure.

```
 1              But what incentive is there to do that?  We're not

 2    going to get any better result.  It just isn't going to

 3    happen.

 4              So with that, again, I ask you to approve the

 5    settlement as submitted.

 6              Thank you.

 7              THE COURT:  All right.

 8              MR. ROBERT SCHUBERT:  Your Honor?

 9              THE COURT:  Sure.

10              MR. ROBERT SCHUBERT:  Your Honor, just one brief

11    comment.

12              Stripped, I think, to its essentials, Mr. Schulman

13    on behalf of Mr. Frank is arguing that the prime

14    consideration in determining the reasonableness of the

15    attorneys' fees is to look at the actual amount of the

16    money claimed.

17              But there's a big problem with that.  Inevitably,

18    in a product that sells for a few dollars, full

19    compensation will result in just a few dollars in payment.

20    Inevitably, no matter what you do, the claims rate is never

21    going to approach 100 percent or 50 percent or 25 percent.

22              So if you look at the amount claimed as a measure

23    of attorneys' fees, the attorneys' fees will be low.  It

24    will become entirely impossible, impractical, to pursue

25    these consumer class actions.
```

1          We felt, contrary to the defendants, we had a

2    strong case with significant misrepresentations that led

3    people to trade up to the Ultra batteries rather than the

4    garden variety CopperTop batteries.

5          But to prove that, you need experts on battery

6    chemistry.  You need experts on damages.  You have to get

7    through class certification, which Your Honor notes is

8    becoming more and more difficult throughout the country.

9    There's an enormous amount of work to do against very

10   competent, highly paid defense attorneys.

11         So if you adopt the approach that Mr. Frank is

12   taking, he'll make it impossible across the board in

13   pursuing -- I'll call them low, not low value but

14   low-priced consumer products, to put it in blunt terms.

15         Now, whether or not Mr. Frank intends it or not,

16   you will then discourage consumer class actions except in

17   situations where the product is like a high-priced TV or an

18   automobile.  And this will have, I think, a very

19   deleterious effect on pursuing these kind of cases.

20         The FTC and other agencies have very limited

21   resources.  And it's clear that private enforcement under

22   both the California and Florida statutes and statutes

23   across the country is an important function.

24         That's where we're going with this.  And I'll

25   leave it right there.  I think that supports the

 1   reasonableness of this.  And it's highly distinguishable

 2   from the cases in which Mr. Frank has prevailed because

 3   there's a possibility of full recovery for people who take

 4   the time to fill out the claim form.

 5           I thank the Court for the time.

 6           THE COURT:  Thank you, sir.

 7           Anything further from P & G?

 8           MR. STEWART:  Very briefly, Your Honor.

 9           I can confirm that Procter & Gamble does not have

10   information about who these purchasers are of these

11   batteries.

12           Mr. Schulman referred to the Bayer case.  The

13   Court didn't order in that case that they go back and do

14   this subpoenaing of all the retailers.  That was something

15   that the parties had agreed to.

16           And I think as Mr. Lowe pointed out, there is no

17   case.  In fact, the cases are to the contrary, that I'm

18   aware of, suggesting that this could be something that

19   would be ordered by the Court as a condition of settling a

20   case like this.

21           And just as Mr. Schubert indicated, if that were

22   required, it would be a huge disincentive to settlement.

23   Because the cost of trying to track down purchasers of

24   products that sell for a couple of dollars and are sold in

25   retail outlets throughout the country would just be

```
 1   enormous and would eat up the value of any kind of

 2   settlement that the parties might reach.

 3          Mr. Schulman also suggested, well, you know, if

 4   you disapprove this, send the parties back, they're going

 5   to get more for the class.  The class is already being

 6   offered essentially 100 percent compensation.

 7          In the plaintiff's brief, they cite cases where

 8   the courts have acknowledged it's improper to give a

 9   windfall to the class members.  So this isn't -- like the

10   baby products case, the expert testimony there was that the

11   value of the claim was $50, but the class members were only

12   offered $5.  So there it might make sense to send them

13   back.

14          In the Pecover case, they had a right to treble

15   damages, which increased the value of their claim.  But the

16   settlement offered was much lower than the treble damages

17   would be.  Sure, it makes sense maybe to send them back.

18          Here the class is getting full compensation.  I

19   don't think there is any dispute about that.  So I think

20   Your Honor's question, how would you do this differently,

21   is the right question to ask.

22          And I think the parties here have negotiated at

23   length to come to a fair and reasonable settlement.  And as

24   the Ninth Circuit said, a settlement is an offspring of

25   compromise.
```

1          And the fact that the courts think that the final

2    product might have been prettier or smarter or snazzier

3    isn't grounds for rejecting the settlement.

4          And I think that's what Your Honor was saying that

5    the Court's approval is in the FLSA cases, and I think that

6    should be done here as well.

7          Thank you.

8          THE COURT:  All right.  Mr. Schulman, any further

9    comments?

10         MR. SCHULMAN:  Your Honor, just in response to

11   that, I would say I am disputing there is full

12   compensation.  I think you have to judge full compensation

13   based on what the claims alleged in the complaint are.  And

14   they are certainly not getting --

15         THE COURT:  It's full according to the formula

16   they use.

17         MR. SCHULMAN:  In the settlement, correct.  The

18   prior case specifically rejects that, that you can judge

19   based on what full compensation, based on what the parties

20   settle for.

21         It's full based on -- there's several ways -- even

22   if you say that the differential damages, the amount of the

23   premium is the only measure for compensation, it's still

24   not full.

25         There's these proof of purchase caps.  Nobody

1   saves receipts for batteries for the last five years.

2   Meaning that that's why you see an average payment to the

3   claimants of $6 here.  And it's not full if they bought ten

4   packs of batteries --

5          THE COURT:  How else would you settle a case like

6   this?  Because there are no records.  You don't have retail

7   sale records.  You don't know whether one person bought two

8   cells or two people bought forty-two cells.  You don't

9   know.  You've got to come up with some sort of reasonable

10  compromise.

11         And I think that their argument is taking the

12  numbers that they do have and trying to extrapolate that

13  they came up with a formula which provides in their view

14  100 percent compensation.

15         MR. SCHULMAN:  Well, there's a number of different

16  ways they can settle.

17         As I said, I think the Bayer case is the most on

18  point because it's purchasers of a $5 product.  They went

19  to the retailers, the pharmacies, the grocery stores that

20  sell that product.  It was combination aspirin.

21         And they got their records from them.  And then

22  they send them a check.  They sent all those people a

23  check.  And the compensation went from $300,000 to

24  $5 million.  It would be very similar to what you would see

25  in this case.

```
1            THE COURT:  All right.  Well, I'll take a look at

2      that.

3            I want to thank you all for your very professional

4      presentations and your help.  I will endeavor to get

5      something out on this as soon as I can.

6            Is there anything else anybody feels compelled to

7      say before I adjourn?

8            MR. LOWE:  This is something I just want to make

9      clear, not basically to the Court, but to Mr. Schulman.  We

10     have evidence of the damages in this case.  It wasn't part

11     of the settlement.  We didn't craft this part of the

12     settlement.  We had to come up with a damage analysis

13     before we moved for class certification.  We expended a lot

14     of time and a lot of expert money on reviewing sales data

15     in coming up with the difference.

16           THE COURT:  Well, I think the difference is

17     probably easily supportable through economic or statistical

18     methodology.  I think the question is the number of

19     purchases.

20           I mean, it's one thing to say $3 for a million

21     people.  But $3 or $6 for 7 million people is a lot

22     different.

23           MR. LOWE:  We also came up with the average number

24     of batteries purchased per household per year.  And all of

25     this falls within the maximum amount of batteries that
```

1    would have been purchased during the pertinent time frame.

2    And that's how we came up with the $6.

3            Now, also, in a lot of these cases he's talking

4    about, they require receipts to get paid and so forth.

5    That's not one required here.  I mean, it's just --

6            THE COURT:  Well, it just wouldn't be feasible.

7            MR. LOWE:  Of course not.  And this was eminently

8    fair.

9            Now, I can't help the claims rate.  The notice

10   provisions were excellent, I thought, under the

11   circumstances.  In fact, it reached more, as you can see in

12   the McComb deposition or declaration, it reached more

13   people than they thought.

14           Because once it hit, you know, certain news sites

15   and Internet sites, I was getting Emails weekly just from

16   class action blogs and things that I'm a member of saying

17   look at this settlement, look at this settlement.  And then

18   it was also on consumer sites.  So it went beyond what the

19   intended scope of the notice was for -- for the

20   administrator.

21           So as she said in her declaration, it reached more

22   than the intended 70.4 percent.  So this is a case of, if

23   people didn't want the $6, they just didn't ask for it.

24   Because there was no impediment to someone getting the

25   benefits of this settlement that we achieved.

```
 1              THE COURT:  All right.

 2              MR. LOWE:  Thank you.

 3              THE COURT:  I know you all have put a lot of work

 4     in this.  I'll try to do my part and try to get something

 5     out.

 6              MR. LOWE:  Thank you, sir.

 7              (Proceedings adjourned at 1:48 p.m.)

 8

 9                   C E R T I F I C A T E

10

11          I certify that the foregoing is a correct

12     transcript from the record of proceedings in the

13     above-entitled matter.

14

15     s\Amie R. First, RPR, CRR

16

17

18

19

20

21

22

23

24

25
```